EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| OFICINA DE ETICA GUBERNAMENTAL<br>    Demandante- Recurrida<br><br>    v.<br><br>RAFAEL CORDERO SANTIAGO<br><br>    Demandado-Peticionario<br>_____<br>OFICINA DE ETICA GUBERNAMENTAL<br><br>    Demandante-Peticionaria<br><br>    v.<br><br>HON. RAMON LUIS RIVERA<br><br>    Demandado-Recurrido | 2001 TSPR 118 |

Número del Caso: CC-1998-68 Y CC-1999-144 consolidados

Fecha: 22/08/2001

Tribunal de Circuito de Apelaciones

Juez Ponente del TCA en el caso OEG v. Hon. Rafael Cordero Santiago: Panel integrado por su Presidente, Juez Negrón Soto y los Jueces Aponte Jiménez y Segarra Olivero, Circuito Regional V

Juez Ponente del TCA en el caso OEG v. Hon. Ramón Luis Rivera: Hon. Ivonne Feliciano Acevedo, Circuito Regional l

Abogado de  Hon. Rafael Cordero Santiago: Lic.Antonio Zapater Cajigas

Abogado de Hon. Ramón Luis Rivera:  Lic. Héctor Santiago Rivera

Abogados de la OEG: Lic. Hiram R. Morales, Director Ejecutivo; Lic. Arnaldo López Rodríguez; Lic. Reyna M. Tejeda Cordero, Lic. William E. Oconnor, Lic. Anaida Garriga Laporte, Lic. Carmen I. Amy

Abogado del Amicus Curiae Asociación de Alcaldes de P.R.: Lic. Miguel A. Hernández Agosto

Abogado del E.L.A.:  Hon. Procurador General
                     Lic. Héctor Clemente Delgado
                     Procurador General Auxiliar

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Oficina de Ética Gubernamental

    Recurrida

                                         CC-1998-68

       v.

Hon. Rafael Cordero Santiago

    Peticionario
_____

Oficina de Ética Gubernamental

    Peticionaria

                                         CC-1999-144

       v.

Hon. Ramón Luis Rivera

    Recurrido

San Juan, Puerto Rico a 21 de agosto de 2001

En cuanto a los acápites I al V la Juez Asociada señora NAVEIRA DE RODÓN emitió la Opinión del Tribunal. Con los acápites I y II estuvieron conformes el Juez Presidente señor Andréu García, la Juez Asociada señora Naveira de Rodón, y los Jueces Asociados señores Hernández Denton, Fuster Berlingeri, Corrada del Río y Rivera Pérez. En cuanto a los acápites III al V, estuvieron conformes el Juez Presidente señor Andréu García, la Juez Asociada señora Naveira de Rodón y los Jueces Asociados señores Hernández Denton y Fuster Berlingeri. En cuanto a los acápites VI y VII estuvieron conformes el Juez Presidente señor Andréu García, la Juez Asociada señora Naviera de Rodón y el Juez Asociado señor Hernández Denton. El Juez Asociado señor Hernández Denton emitió Opinión de conformidad. El Juez Asociado señor Rebollo López concurre con el resultado por entender que ni el Alcalde Hon. Rafael Cordero Santiago ni el ex alcalde Hon. Ramón Luis Rivera infringieron disposición legal alguna. El Juez Asociado señor Fuster Berlingeri emitió Opinión de conformidad en parte y concurrente en parte. El Juez Asociado señor Corrada del Río emitió Opinión concurrente con el resultado en cuanto al Art. 3.3(b), por entender que el mismo es inconstitucional por vaguedad, a la cual se unió el Juez Asociado señor Rivera Pérez sólo en cuanto a este extremo.

      Por ser en ambos casos de epígrafe una de las controversias

principales la determinación de qué conducta constituye una violación

al Art. 3.3(b) de la Ley de Ética Gubernamental, Ley Núm. 12 de 24 de

julio de 1985, 3 L.P.R.A. § 1823(b) (en adelante Art. 3.3 (b)), los hemos consolidado.

I

**CC-1998-68** *(Alcalde Hon. Rafael Cordero Santiago)*

Durante el periodo de 1989 a 1995, el Municipio Autónomo de Ponce (en adelante Municipio de Ponce) realizó negocios con la firma Dominicci Air Conditioning (en adelante Dominicci), entre ellos la compra e instalación de unidades de acondicionadores de aires.[1] Aunque formalizados a través de la Junta de Subastas y revisados por la División Legal del Municipio, el Alcalde Hon. Rafael Cordero Santiago (en adelante Alcalde de Ponce o Cordero Santiago) era la persona autorizada para firmarlos e impartirles la aprobación final.

Vigente esta relación contractual, el 23 de noviembre de 1991, Cordero Santiago compró a Dominicci, para su residencia privada, seis (6) consolas de aires acondicionados y la correspondiente instalación de las mismas, a un costo total de seis mil ochocientos once (6,811.00) dólares. Surge de la factura que dicho precio incluyó, no solamente las seis (6) consolas de aire acondicionado, sino también el costo de los materiales y equipo necesarios para la instalación de éstos, y las horas de servicio, que totalizaron cincuenta. **El Alcalde de Ponce no incluyó esta transacción en su Informe Financiero correspondiente al año 1991.**

Por tales hechos, previa la correspondiente querella, la Oficina de Ética Gubernamental (en adelante Oficina) determinó que el Alcalde de Ponce infringió los artículos 3.3(b) y 4.4(12) de la Ley de Ética

---

[1] Los contratos entre Dominicci y el Municipio de Ponce ascendieron a la cantidad de $134,234.50. Según surge de las copias de los contratos realizados entre las partes, las cuales obran en el expediente del caso, el primero de dichos contratos, firmado el 12 de septiembre de 1989, fue por $30,265.00. El segundo contrato, de fecha de 2 de septiembre de 1993 fue por la suma de $88,609.50. Este último contrato fue enmendado el 13 de octubre de 1993, para añadir unos servicios adicionales, y se acordó el pago de $104,969.50.

Gubernamental e impuso multa de $6,000.00 por ambas violaciones, sin especificar la cantidad correspondiente a cada violación.

El Tribunal de Circuito de Apelaciones (en adelante Tribunal de Circuito) confirmó el dictamen administrativo al rechazar las alegaciones del Alcalde de Ponce en cuanto a que él no podía influenciar las actuaciones del Municipio con Dominicci y que el Art. 3.3(b) era excesivamente amplio. Además encontró Cordero Santiago responsable de violar en Art. 4.4(12) de la Ley de Ética, por no haber hecho constar en el informe financiero del año 1991 la compra de los referidos aires. Sin embargo, modificó la multa impuesta, por considerarla excesiva, disminuyéndola a dos mil (2,000.00) dólares por ambas violaciones.

Oportunamente, el Alcalde de Ponce recurrió ante nos aduciendo que cometió error el Tribunal de Circuito al confirmar la determinación de la Oficina sobre la violación del Art. 3.3(b) por éste adolecer de vaguedad; y del Art. 4.4(12) al ser éste excesivamente amplio e injustificadamente invadir su intimidad.

La Oficina compareció mediante "Oposición a que se Expida el Auto de Certiorari". Por otra parte, la Asociación de Alcaldes de Puerto Rico solicitó comparecer como *amicus curiae* y presentó su memorando al respecto. Expuso esencialmente que el Art. 3.3(b) era inconstitucional por razón de vaguedad.

El 24 de abril de 1998, expedimos el auto solicitado y aceptamos la comparecencia de la Asociación de Alcaldes como *amicus curiae*.

Atendamos, en primer lugar, lo referente a la violación al Art. 4.4(12) de la Ley de Ética Gubernamental.

II

El Alcalde de Ponce alega que el Art. 4.4(12) de la Ley es inconstitucional por ser excesivamente amplio e invadir

injustificadamente su intimidad. No obstante, es improcedente analizar este artículo bajo la doctrina de amplitud excesiva, ya que dicha doctrina es aplicable cuando los intereses en controversia se relacionan con la libertad de expresión o asociación. Si éstos no son los intereses afectados, el análisis que procede es bajo la doctrina de vaguedad, como parte del debido procedimiento de ley. Pueblo v. Hernández Colón, 118 D.P.R. 891 (1987). Este es el caso de la disposición impugnada, ya que ésta no afecta intereses relacionados con la libertad de expresión o asociación, sino que exige a los funcionarios públicos incluir en los informes financieros "transacciones de compra, venta y permuta de propiedades muebles o inmuebles".

Una ley es nula por vaguedad si sus prohibiciones no están claramente definidas. Pacheco Fraticelli v. Cintrón, 122 D.P.R. 229 (1988). Las leyes imprecisas pueden engañar al inocente al no proveer un aviso adecuado. Segundo, si ha de prevenirse la aplicación arbitraria y discriminatoria, las leyes deben proveer normas claras para aquellos que las aplican. Vives v. Tribunal Superior, 101 D.P.R. 139 (1973).

Al analizar el Art. 4.4(12) a la luz de esta doctrina, se puede concluir que el mismo no adolece de vaguedad. La ley establece con meridiana claridad quienes deben radicar informes financieros. Además, dispone que el director de la Oficina podrá exigir que se incluya en los informes financieros las "transacciones de compra, venta o permuta de propiedades muebles e inmuebles".

Por su parte, el Reglamento sobre Radicación de Informes Financieros, Expediente Núm. 3549 de 11 de diciembre de 1987, dispone en su sec. 4.301(b)(1)que todo informe financiero deberá contener la información descrita en los formularios adoptados por la oficina de ética gubernamental, y que dicha información incluirá los **"activos poseídos y/o adquiridos** por la persona obligada a radicar el informe financiero durante el año natural **que tengan un justo valor en el**

**mercado en exceso de mil (1,000) dólares**...; y todos aquellos activos que produzcan ingresos en exceso de cien (100) dólares....” (Énfasis suplido).

Podemos ver cómo de las disposiciones de ley y reglamento se desprende que existe un deber de informar todos los activos adquiridos durante el año que tengan un valor que sobrepase los mil (1,000) dólares. Por tanto, debemos concluir que el Art. 4.4(12) no adolece de vaguedad.

Por otra parte, consideramos que el Art. 4.4(12) no constituye una intromisión indebida en el derecho a la intimidad del Alcalde de Ponce.

El Art. II Sec. 8 de la Constitución del Estado Libre Asociado de Puerto Rico dispone la protección a los ataques abusivos contra la honra, vida privada y familiar de cada individuo. No obstante, ese derecho no es absoluto.

Hemos señalado que uno de los factores a considerar para determinar si se justifica o no una intervención con la intimidad, en el caso específico de solicitarle al individuo cierta información, es si existe una política pública o interés público reconocible que incline la balanza a favor del acceso a la información solicitada. Además, deben considerarse las medidas para prevenir que dicha información sea divulgada, el tipo de documento requerido y la información que contiene. Véase E.L.A. v. P.R. Telephone Co., 114 D.P.R. 394 (1993).

La Ley de Ética Gubernamental persigue implementar la política pública del Estado en contra de la corrupción. El que los funcionarios públicos se conduzcan de manera honrada en todas sus transacciones financieras es un interés apremiante del estado que justifica la intervención con la intimidad del funcionario público. Además, la ley protege la información requerida en los informes financieros, los cuales pueden hacerse públicos sólo a petición de parte debidamente fundamentada. El procedimiento para solicitar y obtener autorización para tener acceso a los informes financieros está detallado en el Art.

4.8 de la Ley. Así, concluimos que el Art. 4.4(12) no viola el derecho a la intimidad.

Nos resta pues considerar si el Alcalde de Ponce incurrió en una violación al Art. 4.4(12).

Como ya hemos señalado, la ley exige que los funcionarios obligados a radicar informes financieros tienen que informar en éstos las transacciones de compra, venta o permuta de bienes muebles e inmuebles. En virtud del Reglamento de Radicación de Informes Financieros, existe un deber de informar las transacciones con activos cuyo valor en el mercado exceda los mil (1,000) dólares.

El señor Cordero Santiago omitió informar la compra de los acondicionadores de aire para su residencia privada. En su contestación a la querella, el alcalde admitió haber realizado la transacción de negocio con Dominicci, y alegó no haber incluido la misma en el informe financiero por entender que no estaba obligado a hacerlo. Por su parte, la Oficina determinó que, por razón de que el **negocio** con Dominicci fue por más seis mil ochocientos once (6,811) dólares, debió incluir dicha transacción en el informe financiero correspondiente al año 1991.

No obstante, de la factura de compra de los referidos aires surge que el costo total de la transacción incluyó, no solamente las seis (6) unidades de aire acondicionado individualmente, sino que además ese precio incluyó otros materiales y equipo necesarios para la instalación de los aires, y un total de cincuenta (50) horas de servicio de instalación.

Ante estos hechos, concluimos que el Alcalde Cordero Santiago no violó el Art. 4.4(12) ya que de la prueba del expediente no surge claramente que el señor Cordero tuviese la obligación de incluir transacción con Dominicci en el informe financiero. Obsérvese que el Reglamento exige que se informen los bienes muebles adquiridos que excedan los mil (1,000) dólares. Según se desprende de una lectura del

reglamento, este costo es <u>por unidad</u>.[2] Así, no constando en la factura que el costo de cada uno de los acondicionadores de aire fuese más de mil (1,000) dólares, y tomando en consideración que los seis mil ochocientos once (6,811) dólares que sumó la transacción incluyen otros servicios además del costo de los acondicionadores de aire *per* sé, concluimos que no existe prueba suficiente en el expediente para encontrar al señor Cordero Santiago incurso en violación al Art. 4.4(12).

Queremos destacar que la sec. 4.504(2) del Reglamento dispone para que, de encontrarse alguna deficiencia en el informe, el funcionario pueda someter la información adicional que se le solicite, y si no está de acuerdo, solicitar una vista o presentar sus argumentos al respecto por escrito. Si se determina que los argumentos no satisfacen los requisitos del informe, "se indicará la acción remedial que debe tomarse para que el informe financiero cumpla con los requisitos."

No obstante, los hechos en el caso de Alcalde de Ponce indican que aunque el reglamento provee este remedio, en la práctica no se sigue estrictamente este procedimiento. El señor Cordero Santiago, aunque impugnó la necesidad de incluir la transacción que realizara con Dominicci en el informe financiero, admitió que hizo dicho negocio, y sometió la factura que evidenciaba el mismo, la cual obra en el expediente de la prueba documental sometida en la vista administrativa.

Entendemos pues, que no se justifica el que Oficina impusiera al señor Cordero Santiago la violación al Art. 4.4(12), cuando ya ésta tenía en su poder la información que precisamente constituía la deficiencia alegada en el informe financiero. El señor Cordero Santiago en ningún momento negó haber comprado los acondicionadores de aire a Dominicci. Más bien, una vez notificado de la querella radicada por la Oficina, admitió en su contestación a ésta que compró los

---

[2] El Art. 4.301(b)(2), luego de indicar que se tienen que informar todos los activos en exceso de mil (1,000) dólares, establece que se acompañará "una descripción de **cada activo** incluyendo la fecha de cualquier venta, compra o permuta." (Énfasis suplido).

acondicionadores de aire y la cantidad que pagó por ellos. Al así actuar, el Alcalde de Ponce neutralizó las consecuencias adversas que pudo haber tenido la omisión en el informe financiero. No obstante, la Oficina le encontró incurso en violación al Art. 4.4(12).

Estos hechos demuestran que, a pesar de las disposiciones del Reglamento, no se le ofrece al funcionario una oportunidad real de corregir el informe o explicar las razones de la omisión, y que esto se tome en consideración al determinar si se violó la ley.

Aún en los casos en que exista la obligación legal de hacer constar una transacción en el informe financiero, la mera omisión de un dato en éste no debe ser fundamento para encontrar a un funcionario o empleado público incurso en violación de la Ley de Ética Gubernamental. El funcionario al cual se le impute haber infringido el Art. 4.4(12) debe tener la oportunidad real de explicar las razones de por las cuales no incluyó cierta información en el informe, si fue por olvido o inadvertencia, si tiene un fundamento de ley o reglamento válido en virtud del cual crea de buena fe que no era necesario incluir determinada transacción en el informe, o si por el contrario, la omisión fue intencional, o se desprende de la naturaleza de ésta el propósito de cometer fraude u o ocultar una transacción indebida. También deben analizarse las consecuencias de la omisión, si la misma puede subsanarse, y la celeridad con que el funcionario ponga a disposición de la Oficina la información omitida una vez se le notifica la falta. Estos factores deben tomarse en consideración, no sólo para determinar si se incurrió en la violación de ley, sino también al imponer sanciones y multas administrativas.[3]

---

[3]    En cuanto a la imposición de multas por dejar de radicar informes financieros o falsificarlos, la ley dispone que en casos penales, la multa será de dos mil ($2,000) dólares y con agravantes hasta cinco mil (5,000) dólares. No obstante, el delito configurado exige que se demuestre que la persona incurrió en la violación de ley **a sabiendas y voluntariamente**. 3 L.P.R.A sec. 1841(a)(1). En cuanto a las acciones de naturaleza civil, la sec. 1841(b)(2) dispone una sanción de una suma equivalente al triple del **beneficio económico** recibido. Vemos pues cómo, cuando la ley contempla multas que pudiéramos calificar como

Deseamos enfatizar en que esta solución no significa que hacemos más laxo el requisito de radicar informes financieros. Es responsabilidad de todo funcionario público a quien la ley le requiera la radicación de estos informes, el someter los mismos con toda la información que la ley exige. Lo que aquí resolvemos es que, antes de imponer una sanción o multa administrativa por violación al Art. 4.4, se deben analizar las razones de la omisión, de manera que si se impone la sanción, ésta guarde relación lógica con el mal que la ley intenta remediar y por lo tanto, sea justa y equitativa.

Corresponde ahora analizar la controversia que dio lugar a la consolidación de los casos de los Alcaldes Rafael Cordero Santiago y Ramón Luis Rivera, o sea, si éstos incurrieron en violación al Art. 3.3(b) de la Ley de Ética Gubernamental.

III

A.

Como ya hemos relacionado en el acápite I, la conducta que dio lugar a que se encontrara al Alcalde de Ponce en violación del Art. 3.3(b) fue que el señor Cordero compró unas unidades de aire acondicionado para su residencia privada a Dominicci Air Conditioning, entidad que a su vez tenía contratos con el Municipio de Ponce. El Alcalde atacó la constitucionalidad del Art. 3.3(b), por razón de vaguedad.

B.

**CC-1999-144** *(Hon. Alcalde Ramón Luis Rivera)*

En el segundo caso consolidado, un grupo de personas, incluyendo algunos empleados del Municipio de Bayamón, (en adelante grupo de

---

ilimitadas, lo hace en casos en que se pruebe que el funcionario ha recibido un beneficio económico indebido.

Bayamón) se organizó para recaudar fondos para obsequiar un vehículo al entonces alcalde de dicho municipio, Hon. Ramón Luis Rivera (en adelante Alcalde de Bayamón o Rivera). En junio de 1991, este grupo le entregó al Alcalde de Bayamón un vehículo marca Blazer 1991 de la empresa Losada Auto Truck, Inc. (en adelante Losada). Entre el 29 de agosto de 1990 y el 20 de febrero de 1993, Losada hizo ventas de vehículos al Municipio de Bayamón en virtud del contrato entre el Municipio y Losada, obtenido a través de subasta pública.[4]

Losada le concedió al grupo de Bayamón un plan de pago privilegiado no convencional que se ajustó de acuerdo a como se fuesen consiguiendo los donativos, y sin la intervención de una casa financiera.[5] Todos estos trámites se efectuaron por vía telefónica entre la señora Inés Barnés, Directora de Relaciones Públicas del Municipio de Bayamón, y el señor Luis Mayoral Bravo, vendedor de Losada.

El Alcalde de Bayamón, luego de aceptar el vehículo, decidió que éste sería para uso de su esposa, la señora Angélica Cruz de Rivera, y optó por cambiar el vehículo marca Blazer por un auto Lumina de 1991.[6] El Alcalde de Bayamón acordó pagar la cantidad de cuatro mil dólares ($4,000) para cubrir la diferencia de precio entre los dos vehículos. La orden de compra —o factura— para el auto Lumina tenía fecha de 9 de agosto de 1991 y estaba a nombre de la señora Angélica Cruz de Rivera.[7]

---

[4]    Los negocios realizados por Losada y el Municipio de Bayamón durante los años 1990 a 1993 ascendieron a la suma de $1,748,352.00, según surge del informe de la oficial examinadora.

[5]    Según el vendedor del vehículo, señor Luis Mayoral Bravo, esta forma de pago se concede en contadas ocasiones, a clientes especiales, con la autorización del presidente de Losada. El señor Mayoral Bravo explicó en la vista ante la Oficial Examinadora de la Oficina de Ética Gubernamental, caso núm. 95-46 de 20 y 21 de noviembre de 1996, págs. 31-32, que este tipo de venta se concede a amistades de Losada, a personas que puedan responder o a personas referidas por alguien que tiene credibilidad dentro de la empresa.

[6]    Estos datos surgen de una carta de 30 de agosto de 1993, dirigida al señor Héctor Feliciano Carreras de la Oficina de Ética Gubernamental y firmada por el propio Alcalde.

[7]    Entre los documentos que obran en autos existe una incongruencia en el año en que el Alcalde recibiera el vehículo. En la carta que

El grupo de Bayamón no hizo pago alguno en relación con los vehículos Blazer y Lumina. Fue el Alcalde quien tuvo que pagar la totalidad, saldando finalmente la cuenta el 12 de septiembre de 1994.[8]

Por estos hechos, el 20 de marzo de 1995, la Oficina radicó una querella contra el Alcalde de Bayamón por haber violado el Art. 3.3(b). Luego de celebrar una vista, la Oficina determinó que el Alcalde de Bayamón incurrió en violación del Art. 3.3(b) y que procedía la imposición de una multa administrativa de cuatro mil (4,000) dólares.

El 21 de enero de 1999, el Tribunal de Circuito revocó la determinación de la Oficina. Determinó que **las circunstancias particulares en que surgieron los hechos cuestionados claramente denotan que no se trata de corrupción gubernamental ni de indebida influencia de poder para obtener ventajas o privilegios no permitidos por ley**.

Inconforme con este dictamen, la Oficina acudió ante nos y señaló como error la determinación de hecho del Tribunal de Circuito de que el Alcalde de Bayamón no había negociado con Losada, por lo que no incurrió en violación del Art. 3.3(b).


IV


El peticionario Cordero Santiago cuestiona la validez constitucional del Art. 3.3(b)[9]. Analizaremos este planteamiento en

---

dirigiera el Alcalde al señor Héctor Feliciano Carreras, de la Oficina de Ética Gubernamental, aparece que fue durante el 1992 que el Alcalde recibió dicho vehículo. Los demás documentos (transcripción de la vista ante la Oficial Examinadora, orden de compra del auto, etc.) revelan que fue durante el 1991.

[8] Este dato surge de una carta del gerente del Departamento de Crédito y Cobro de Losada dirigida a la señora Angélica Cruz de Rivera. El 22 de junio de 1994 (casi tres años después de entregar el vehículo), el señor Diosdado Madera del Departamento de Cobro de Losada, envió una carta a la Sra. Barnés como presidenta del grupo de Bayamón requiriéndole el pago total de $18,500 por concepto del auto Lumina. Copia de esta carta se le remitió a la señora Angélica Cruz de Rivera.

[9] En su comparecencia como *amicus curiae* la Asociación de Alcaldes también sostiene que el Art 3.3(b) es inconstitucional por vaguedad.

primer lugar, dirigiéndonos por el principio de hermenéutica de que el poder judicial, en abono de una deferencia hacia el poder legislativo, **debe esforzarse por lograr interpretaciones congruentes y compatibles con el mantenimiento de la constitucionalidad de una ley**. Banco Popular v. Municipio de Mayagüez, 126 D.P.R. 653, 660 (1990).

Como ya indicáramos, una ley es nula por vaguedad si sus prohibiciones no están claramente definidas. La doctrina de vaguedad se ha utilizado tradicionalmente para evaluar estatutos de índole penal. En ese contexto, hemos establecido que una ley es nula por razón de vaguedad si: (1) una persona de inteligencia promedio no queda debidamente advertida del acto u omisión que el estatuto pretende prohibir y penalizar; (2) se presta a la aplicación arbitraria y discriminatoria, e (3) interfiere con el ejercicio de derechos fundamentales garantizados por la Constitución. Pacheco Fraticelli v. Cintrón, supra.

La violación al Art 3.3(b) de la Ley de Ética puede conllevar sanciones de naturaleza penal, por disposición expresa del Art. 3.8 de la Ley.[10] No obstante, el caso que nos ocupa no se trata de un procedimiento criminal, sino uno administrativo. En los procedimientos administrativos, no aplican, en términos absolutos, las garantías de debido proceso de ley procesal elaboradas para los estatutos penales. Pagán Hernández v. U.P.R., 107 D.P.R. 720 (1978). Además, una consecuencia de carácter penal no significa que sean aplicables los

---

Por su parte, el Alcalde de Bayamón en su "Alegato en oposición a la solicitud de certiorari" se limitó a argumentar principalmente que la determinación de hechos realizada por la Oficina de Ética Gubernamental fue incorrecta, por lo que debía confirmarse la sentencia del Tribunal de Circuito. Aunque el alcalde argumentó que no se podía castigar a una persona por delitos que no estuviesen expresamente definidos en la ley, y mencionó los requisitos para que una ley sea declarada inconstitucional por razón de vaguedad, su contención en este sentido fue a los efectos de impugnar la multa que le impuso la Oficina. El alcalde no hizo alegación específica en cuanto a que el Art. 3.3(b) era inconstitucional por razón de vaguedad.

[10] Dicho artículo dispone que "Toda persona que viole intencionalmente las prohibiciones y disposiciones establecidas ... en los incisos (b), (c), (d), y (e) de la sec. 1823 [Art. 3.3], incurrirá en delito grave... 3 L.P.R.A. § 1828(a)(1).

mismos requisitos de rigurosidad que se exigen en los estatutos penales. Dora Nevares-Muñiz, <u>Derecho Penal Puertorriqueño</u>, Parte General, 2da. Edición revisada, 1994, Pág. 106.

A la luz de estos criterios, debemos concluir que el Art. 3.3(b) de la Ley de Ética Gubernamental no adolece de vaguedad. No se puede pretender, por la naturaleza del área que la ley en cuestión regula –el campo moral y ético– que se enumeren específicamente las instancias en que se incurre en violación a dicho artículo. Es importante destacar que estamos frente a un código de ética, y como tal, su aspiración es establecer unas normas de carácter general para guiar la conducta de los funcionarios públicos. A estos efectos, el Art. 3.3(b) dispone:

> Ningún funcionario o empleado público aceptará un empleo o mantendrá[11] relaciones contractuales de negocio, con una persona, negocio o entidad que esté reglamentada por o que haga negocios con la agencia gubernamental para la cual él trabaja, cuando el funcionario participe en las decisiones institucionales de la agencia, o tenga facultad para decidir o influenciar en las actuaciones oficiales de la agencia en relación con dicha persona, negocio o entidad. 3 L.P.R.A. § 1823(b).

El Art. 3.3(b) define cuáles son las personas a quienes les aplica: a los funcionarios públicos con facultad de influenciar las decisiones de la agencia con respecto a una persona, negocio o entidad específica, o que pueden influenciar las decisiones institucionales de la agencia. El artículo también indica cuál es la conducta prohibida: entrar en relaciones contractuales de negocio con una persona que a su vez haga negocios con la agencia para la cual el funcionario trabaja.[12] Tampoco se presta para aplicación arbitraria y discriminatoria. Provee a las personas que han de aplicarla criterios adecuados para ejercer su

---

[11]  La Ley de 1994 añadió el término mantendrá al Art. 3.3(b). No obstante, esta enmienda no afecta el análisis que realizamos en el caso de marras. Por lo tanto, lo expuesto en la sección anterior sobre el desarrollo legislativo de las disposiciones éticas es de gran ayuda para interpretar el alcance de este artículo.

[12]  Debemos tomar también en consideración el hecho de que el reglamento aprobado en 1992 especifica las prohibiciones que contempla el referido Art. 3.3 (b), y explica en mayor detalle el alcance de las mismas.

discreción.[13] En este sentido "[n]o debe confundirse una ley vaga que propicia la aplicación discriminatoria, con el hecho de que toda ley, al ser aplicada, supone el ejercicio de cierta discreción." Dora Nevares-Muñiz, Derecho Penal Puertorriqueño, supra; In re: Guzmán Géigel, 113 D.P.R. 122 (1982); Pueblo v. Tribunal Superior, 81 D.P.R. 763 (1960).

Consideramos que la ley, de acuerdo su propósito y examinadas sus disposiciones en conjunto, establece guías claras sobre lo que el Art. 3.3(b) prohíbe, por lo que el mismo no es inconstitucional.

Examinemos ahora si los Alcaldes Ramón Luis Rivera y Rafael Cordero Santiago efectivamente incurrieron en violación al Art. 3.3(b).

V

Es un principio básico de hermenéutica que las leyes deben interpretarse considerando su razón y espíritu, y examinando y comparando sus partes, las unas con relación a las otras, procurando siempre dar cumplimiento al propósito del legislador. P.N.P. v. Rodríguez Estrada, 122 D.P.R. 490, 500 (1988). Al interpretar una disposición específica de una ley, es nuestra obligación fundamental imprimirle efectividad a la intención legislativa, propiciando de esta forma la realización del propósito que persigue la Ley, siempre, claro está, teniendo presente el fin social que la inspiró. Vázquez v. A.R.P.E., 128 D.P.R. 513, 523 (1991); Zambrana v. E.L.A., 129 D.P.R. 740 (1992); Gobernador de P.R. v. Alcalde de Coamo, 131 D.P.R. 614 (1992).

Al interpretar la disposición en controversia utilizaremos las ayudas extrínsecas que existen para interpretar los estatutos. Entre éstas se encuentran tanto las leyes aprobadas con anterioridad a la disposición que se está interpretando como las que se han aprobado con

---

[13] El Director Ejecutivo de la Oficina de Ética Gubernamental (ahora, y al momento de los hechos) está facultado para emitir opiniones sobre la aplicación y el alcance de la Ley de Ética.

posterioridad.[14]   Además tomaremos en consideración, no sólo la clara intención legislativa según ésta surge de la Exposición de Motivos, sino también cómo ésta se entrelaza con las demás disposiciones de la Ley de Ética Gubernamental para lograr su propósito.

Uno de los propósitos principales para la creación de la Ley de Ética Gubernamental fue el promover y preservar la integridad de los servidores públicos y de las instituciones de nuestro gobierno.   En los informes conjuntos sometidos por la Cámara de Representantes previos a la aprobación de la Ley de Ética Gubernamental de 1985, se expresó que la legislación recomendada "habrá de ser eficaz para prevenir y penalizar el comportamiento **delictivo** de aquellos funcionarios y empleados públicos que en el desempeño de sus labores gubernamentales vulneren los principios básicos de una ética de excelencia."   (Énfasis suplido).   Por su parte, la Exposición de Motivos de la Ley de Ética recoge esta preocupación al disponer que "es intolerable que existan funcionarios públicos en representación de la administración del Gobierno que puedan **lucrarse** del patrimonio del pueblo" (Énfasis suplido).

Para comprender cabalmente el propósito de la referida Ley, consideramos necesario exponer parte de la ponencia del entonces Secretario de Justicia ante la Asamblea Legislativa durante las vistas públicas en torno a la aprobación de la Ley de Ética.   En lo pertinente, el Secretario señaló que: "En los últimos años, ciertamente, han surgido a la luz pública un sinnúmero de casos caracterizados por un alto contenido de **corrupción**.(...)   La **venta de influencias**, los conflictos de intereses y la **conducta impropia e ilegal** de muchos funcionarios públicos ha constituido el tema en los últimos años (...)   Hoy, lamentablemente, las circunstancias terribles de **corrupción gubernamental** nos obligan a considerar este tipo de legislación."   (Énfasis suplido).

---

[14]    Jim Evans, Statutory Interpretation: problems of communication, 277 (1988);  Vepa P. Sarathi, The Interpretations of Statutes, 345-346,

Vemos pues, como de los debates legislativos y de la Exposición de Motivos de la propia Ley surge claramente que **el propósito principal de la Ley de Ética Gubernamental es combatir y ciertamente, prevenir la corrupción en el gobierno, la conducta ilegal de los empleados públicos, el abuso de poder y el ejercicio de influencias indebidas por parte de los funcionarios de gobierno.**

La disposición que aplica a los casos de epígrafe es la que se aprobó en el 1985 en la ley original. Para un mejor entendimiento de la intención legislativa y, por ende, de los parámetros de la Ley de Ética, analizaremos el desarrollo legislativo posterior.[15]

La Ley de Ética Gubernamental fue enmendada por la Ley Núm. 150 de 22 de diciembre de 1994 (en adelante Ley de 1994). En el informe del Senado con relación a dichas enmiendas, se señaló que el gobierno "se percibe también como una estructura burocrática y costosa, donde en ocasiones el **uso de los fondos públicos es inadecuado** y la conducta de algunos funcionarios públicos **no responde a las normas de sana administración gubernamental.**" (Énfasis suplido).

De la Exposición de Motivos de la Ley de 1994 surge que el propósito de las enmiendas fue ampliar el alcance de las prohibiciones contenidas en la Ley de Ética Gubernamental. No obstante, esta ampliación hay que enfocarla dentro de los propósitos principales de la ley. Al analizar la Ley de 1994 y su Exposición de Motivos, se puede colegir que las enmiendas no iban dirigidas a ampliar **todas** las prohibiciones establecidas en la ley original, sino las relativas a los "posibles conflictos de intereses que puedan surgir entre una entidad privada que ha sido contratada por el Gobierno de Puerto Rico para que represente el interés público sobre un asunto donde también la entidad representa intereses particulares reñidos con el fin público. **Estas prácticas concernientes a las relaciones contractuales entre el**

---

3rd Ed., (1986).

[15] Sobre la interpretación de un estatuto recogida posteriormente en una enmienda al mismo precepto legal, véase <u>In re Campoamor Redin</u>, res. el 24 de enero de 2000, 20 JTS 25, pág. 591 (en especial el esc. 5).

**gobierno y el sector privado <u>no figuran entre las prohibiciones éticas</u> <u>ni el alcance del código</u>... A base de estas consideraciones, es imperativo ampliar el alcance de las prohibiciones para evitar todo posible conflicto que le restan al pueblo la confianza en su Gobierno y en sus funcionarios públicos."** (Énfasis suplido).

Como vemos, las enmiendas de 1994 se hicieron con el fin primordial de añadir una serie de prohibiciones no contempladas en la ley original, específicamente, prohibiciones relativas a los contratos entre el Gobierno y el sector privado, y prohibiciones relacionadas con empresas contratadas por el Gobierno que tuvieran conflictos de intereses con los fines públicos que persigue el Estado. Es fácil concluir que estas enmiendas se hicieron para continuar fortaleciendo el principal objetivo de la ley, esto es, evitar la corrupción gubernamental.

Asimismo, a pesar que la Ley de Ética disponía para la aprobación de un reglamento, no fue hasta el 1992 que la Oficina aprobó el Reglamento de Ética Gubernamental, Reglamento Núm. 4827 de 20 de noviembre de 1992 (en adelante Reglamento). El Reglamento, cumpliendo con el propósito fundamental de la Ley de Ética, especificó con mayor detalle el alcance de sus disposiciones.[16]

La sec. 6 del Reglamento, en lo pertinente, expresa que "todo servidor público deberá: (A) evitar tomar cualquier acción, esté o no específicamente prohibida por este título, que pueda resultar en o crear apariencia de: (1) **usar las facultades** de su cargo, propiedad o fondos públicos **para un fin privado**. (Énfasis suplido.)

Por su parte, la sec. 8 del Reglamento dispone, en lo pertinente, que "ningún funcionario o empleado público **utilizará los deberes y facultades** de su cargo ni la propiedad o fondos públicos para obtener, directa o indirectamente, para él, para algún miembro de su unidad

---

[16] La sec. 2 del Reglamento dispone que:
**"Evitar una conducta impropia** y **conflictos de intereses** por parte de los servidores públicos es indispensable para mantener

familiar, ni para cualquier otra persona, negocio o entidad, **ventajas, beneficios o privilegios**, salvo que esté autorizado, expresa o implícitamente, por ley". (Énfasis suplido.)

Finalmente, la sec. 13(A) del Reglamento dispone que no se "aceptará **honorarios, compensación, regalos, pago de gastos o cualquier otra recompensa con un valor monetario** bajo circunstancias en que su aceptación pueda resultar en o crear la apariencia de un conflicto de intereses con sus obligaciones como servidor público" (Énfasis suplido).

De toda esta exposición que antecede, podemos llegar a la conclusión de que **el propósito primordial de la Ley de Ética Gubernamental, según enmendada, y su Reglamento, es combatir y prevenir la corrupción en todas las ramas de gobierno, prohibir que los funcionarios hagan uso de ventajas indebidas en la consecución de sus intereses personales, y que utilicen su posición de liderato y poder para obtener beneficios económicos indebidos.**

VI

No hay decisión ética que pueda ser regulada enteramente por medios externos. En casi todo caso, el primer árbitro es la conciencia individual del funcionario público.[17] El medio externo que regulaba la decisión ética de los Alcaldes querellados era el Art. 3.3(b), el cual nos permite identificar los siguientes elementos: (1) funcionario en particular; (2) facultado para influir o decidir en la actuación de la agencia respecto a una persona, negocio o entidad específica o participe en las decisiones institucionales de la agencia; (3) que esta

_____

estos principios [de honestidad, integridad, imparcialidad y conducta]". (Énfasis suplido).

[17] Adaptado para trazar una analogía de *Developments in the Law: conflicts of interest in the legal profession*. 94 Harvard Law Review 1244, 1446 (1981), el cual discute la aplicación del código de responsabilidad profesional de los abogados. El texto original leía así: "there is no ethical decision that can be entirely regulated by external means. In nearly every case, the first – and probably the last – arbiter is the conscience of the individual attorney."

persona, negocio o entidad tenga un contrato con la agencia en la que
trabaja el funcionario y; (4) que el funcionario público[18] contrate con
dicha persona, negocio o entidad.

Las "relaciones contractuales" se refieren a la doctrina general
de contratos según establecida por el Código Civil de Puerto Rico y la
jurisprudencia.[19]    Según el Diccionario de la Lengua Española,[20]
"negocio" significa una utilidad o interés que se logra en lo que se
trata, comercia o pretende.    Sin embargo, la palabra clave para la
interpretación de la frase "aceptar relaciones contractuales de
negocio" es el verbo "aceptar" ya que éste constituye la acción
prohibida del Art. 3.3(b).[21]

Dentro de los parámetros antes delineados, los elementos
requeridos en el Art. 3.3(b), y el propósito de la Ley de Ética
Gubernamental, analizaremos cada caso de epígrafe para ver si se
configura la violación ética imputada.


A.

El Alcalde de Ponce es un funcionario público facultado para
influir en la actuación municipal.    El Municipio Autónomo de Ponce
sostuvo relaciones contractuales de negocio con Dominicci desde 1989

---

[18]    El Art. 1.2(a)(b)(e) de la Ley de Ética Gubernamental, 3 L.P.R.A.
§ 1802, define "funcionario público" y "empleado público" como personas
que ocupan cargos o empleos en el Gobierno del Estado Libre Asociado de
Puerto Rico, el primero está investido de parte de la soberanía del
Estado.    Las "agencias ejecutivas" se refieren, entre otras entidades,
a los **municipios.**

[19]    Al aprobar las enmiendas a la Ley de Ética, Ley Núm. 150 de 22 de
diciembre de 1994, la Legislatura expresó similar interpretación,
quedando así plasmada claramente que la intención legislativa sobre el
significado de `relaciones contractuales´ se refiere a lo configurado
en el Código Civil y a su vez las decisiones que se han dado
jurisprudencialmente.    Diario de Sesiones, Primera Sesión Ordinaria, 24
de junio de 1993, Vol. 44, Núm. 59.

[20]    Real Academia Española, 21 Ed, 1992, pág. 1015.

[21]    "Aceptar" significa recibir voluntariamente lo que se le da,
ofrece o encarga. Diccionario de la Lengua Española, supra, pág.16-17.

hasta 1995.[22] El 23 de noviembre de 1991, el Alcalde de Ponce le compró a Dominicci seis (6) consolas de aire acondicionado, cuyo costo incluyendo su instalación, era de $6,811.00.[23] Éstas eran para usarlas en su residencia privada. Los cuatro (4) elementos exigidos para incurrir, *prima facie,* en una violación del Art. 3.3(b) están presentes.

B.

En el caso del Alcalde de Bayamón, no está en disputa que el señor Ramón Luis Rivera es un funcionario público con facultad para influenciar las decisiones del Municipio con respecto a los contratos otorgados por el Municipio y cualquier entidad privada. Además, a la fecha de los hechos, Losada tenía un contrato como suplidor de vehículos del Municipio de Bayamón.

Consideramos que el Alcalde Rivera efectivamente sostuvo una relación contractual de negocio con Losada cuando cambió el auto que Blazer que originalmente le fue obsequiado por un Lumina y se comprometió a pagar la diferencia en precio de cuatro mil (4,000) dólares entre la Blazer y el Lumina. Así surge de la carta que el propio alcalde le dirigió a la Oficina. **El hecho que la adquisición original del vehículo haya sido por medio de un "regalo" en nada cambia el hecho de que efectivamente negoció con Losada el cambio del mismo, el financiamiento de la diferencia en precio y que terminó pagando la totalidad del precio de compra.** Asimismo, los términos de esta compra,

---

[22]    Dichos contratos con Dominicci fueron otorgados mediante subasta. Aunque el Alcalde de Ponce sostiene que su ingerencia en el otorgamiento de estos contratos es mínima, ya que él sólo se limita a firmarlos, esta alegación carece de méritos. Aun cuando Cordero Santiago delegó en la Junta de Subastas del Municipio de Ponce todo lo relacionado con la adjudicación de las subastas, la realidad es que únicamente el alcalde tiene la facultad de imprimirle efectividad a dichos contratos mediante su firma. Esto constituye una participación sustancial en el otorgamiento de los contratos realizados mediante subasta pública.

[23]    Como ya señaláramos, este precio incluía no solo el costo de cada unidad de aire, sino también el costo de los materiales y equipo

en la cual no hubo financiamiento o pronto alguno, indican que Losada hizo el negocio en consideración a la persona del señor Ramón Luis Rivera. Vemos pues como, en cuanto al Alcalde de Bayamón, también se cumplen los requisitos para establecer *prima facie* que éste incurrió en una violación al Art. 3.3(b).

No obstante, consideramos que en ninguno de los casos ocurrió una falta a la ética gubernamental. Veamos.

### C.

La Ley de Ética Gubernamental tiene el propósito principal de combatir la corrupción. Así surge del historial legislativo y de su Exposición de Motivos. Ciertamente, la ley pretende evitar que los funcionarios públicos incurran en conducta que sugiera la apariencia de conflicto de intereses y que pueda provocar desconfianza en las instituciones gubernamentales.[24]

No obstante, en vista del propósito de la Ley de Ética Gubernamental, la mera apariencia de conflicto de intereses,[25] por sí sola, no puede conllevar el que automáticamente se encuentre a un funcionario público incurso en una violación ética.

Entendemos que una vez la Oficina establece los hechos que dan lugar a la querella, o sea, un caso *prima facie* de que el funcionario incurrió en conducta que viola el Art. 3.3(b), el funcionario o empleado público al cual se le impute una violación debe tener la oportunidad de demostrar que su conducta no redundó en ventajas indebidas, corrupción, beneficios personales o abuso de su poder y de

---

necesarios para la instalación de éstos, además del servicio de instalación.

[24] Igual propósito y sentido tienen otros códigos de ética, incluyendo el Código de Ética Profesional que rige la profesión de abogado.

[25] Entre las enmiendas de 1994, se incorporó a la Ley de Ética Gubernamental la definición de conflicto de intereses: "aquella situación en la que el interés personal o económico del servidor público o de personas relacionadas con éste, está o pueda razonablemente estar en pugna con el interés público".

ser así, no debe encontrársele incurso en violación a la Ley de Ética.[26]

La carga de la prueba para establecer esta defensa corresponderá al funcionario, ya que éste está en mejor posición de ofrecer la prueba documental y testifical que establezca que su actuación no es constitutiva de un acto de corrupción.

Los factores que esbozamos en esta opinión deberán considerarse no solamente para determinar si efectivamente ocurrió una violación a la ética, sino también al momento de imponer la sanción o multa administrativa, de encontrarse a un funcionario incurso en violación a ley.

Es importante destacar que ni la ley ni su reglamento contienen una disposición específica sobre la cuantía a imponer como sanción administrativa por violaciones éticas. En ausencia de disposición al respecto, la cuantía máxima a imponerse en estos casos es la contemplada en la Ley de Procedimiento Administrativo Uniforme (L.P.A.U),[27] sec. 7.1. Esta sección dispone que "toda violación a las leyes que administran las agencias o a los reglamentos emitidos al

---

[26] A manera de ejemplo, el Canon 21 de Ética Profesional proscribe el que los abogados representen intereses encontrados. En este sentido, hemos expresado que bajo el Canon 21, los abogados deben evitar hasta la apariencia de conflicto de intereses. In re Pizarro Santiago, 117 D.P.R. 197 (1986). No obstante, la apariencia de conflicto de intereses no conlleva el que automáticamente se encuentre al abogado incurso en violación a la ética profesional. Por el contrario, este Tribunal ha establecido, en el contexto de una moción de descalificación de abogado, que al evaluar dicha moción, se deben sopesar, entre otros factores, los intereses en conflicto y **la gravedad del conflicto de interés envuelto.** Liquilux Gas Corp. v Berríos, 138 D.P.R. 850 (1995). (Énfasis suplido). Como vemos, se ofrece al abogado la oportunidad de demostrar si efectivamente existía tal conflicto y si el mismo es de tal grado que pueda conllevar un conflicto ético.

Por otra parte, la Regla 6 del Código de Ética para los funcionarios, empleados, ex-funcionarios y ex-empleados de la Rama Judicial de 1 de abril de 1998, la cual es análoga al Art. 3.3(b), dispone que: "Ningún funcionario o empleado que tenga a cargo funciones relacionadas con los procesos de evaluación de propuestas, adjudicación y negociación de contratos podrá efectuar, recomendar o adjudicar propuestas o contratos relacionados de los cuales **devengue beneficio, ganancia, comisión o interés pecuniario personalmente o para un familiar cercano.**" Vemos pues como la prohibición que se establece en esta regla para los empleados de la Rama Judicial tiene como condición que el funcionario obtenga un beneficio o ganancia indebida que pueda sugerir un conflicto de intereses.

amparo de las mismas podrá ser penalizada con multas administrativas que no excederán cinco mil (5,000) dólares por casa violación". 3 L.P.R.A. sec. 2201.

No obstante, aunque la L.P.A.U. permite la imposición de hasta cinco mil (5,000) dólares por cada violación de ley o reglamento administrativo, al imponer multas administrativas bajo la Ley de Ética, debe tomarse en consideración que el Art. 3.8 de la ley, el cual tipifica como delito grave la violación al Art. 3.3(b), entre otros, contempla una multa de dos mil (2,000) dólares de encontrarse al funcionario culpable del delito, y de mediar circunstancias agravantes, la multa máxima podrá ser hasta de tres mil (3,000) dólares.[28] Estos parámetros que dispone la ley para la imposición de multas de carácter penal deben guiar a los tribunales y a la Oficina al momento de imponer sanciones administrativas por violaciones a la Ley de Ética, en aras de que no se impongan a los funcionarios públicos multas que resulten ser excesivas en relación con la falta ética cometida.

Debemos señalar que la ley dispone "toda persona que reciba un **beneficio económico** como resultado de una violación a este subcapítulo vendrá obligado a pagar al Estado como sanción civil por su incumplimiento una suma equivalente a tres (3) veces el valor del beneficio económico recibido." 3 L.P.R.A. sec. 1828(b)(3) En estos casos, la sanción económica resultante podría ser mayor que los límites establecidos en la propia L.P.A.U. No obstante, esta sanción, por sus propios términos, está limitada a los casos en que se pruebe que el funcionario recibió un beneficio económico, y se entiende aplicable cuando la falta ética haya sido de naturaleza grave, o sea, un caso de claro de corrupción gubernamental.

Creemos que la solución a la que hoy llegamos adelanta el propósito principal de la Ley de Ética Gubernamental: combatir la

---

[27] Ley Núm. 170 de 12 de agosto de 1988, 3 L.P.R.A. secs. 2101 et seq.

[28] 3 L.P.R.A. sec. 1828(1).

corrupción en todas las esferas del gobierno. Aunque nuestro país se ha visto en los últimos años sumergido en una ola de corrupción gubernamental que parece ahogarnos, no debemos permitir que en el afán de buscar soluciones inmediatas, desvirtuemos los propósitos de la Ley de Ética Gubernamental, convirtiéndola en un instrumento para cometer injusticias, dañar permanentemente la reputación de funcionarios públicos que han servido al país con dignidad, honradez y dedicación, y desalentar el que las personas más capacitadas escojan dedicarse al servicio público.

Aplicando esta norma concluimos que de acuerdo a los propósitos de la Ley de Ética Gubernamental, el señor Ramón Luis Rivera no incurrió en violación al Art. 3.3(b). Aunque la Oficina demostró un caso *prima facie* de infracción al referido artículo, ya que el entonces Alcalde de Bayamón negoció con una entidad que tenía a su vez negocios con el Municipio de Bayamón, no se alegó ni se demostró que el señor Rivera hubiese obtenido algún beneficio económico, ventaja indebida o hubiese abusado de las facultades de su cargo.

El único beneficio que se podría señalar que obtuvo el Alcalde, fue el financiamiento especial que obtuvo el grupo de Bayamón cuando adquirieron originalmente el vehículo Blazer. No obstante, este beneficio no fue ni tan siquiera solicitado por el propio Alcalde. Por el contrario, cuando el Alcalde negoció con Losada financió el pago de la diferencia en precio de cuatro mil (4,000) dólares por el cambio de vehículo. Además, en cuanto el señor Rivera se enteró de que el grupo que originalmente le obsequió la guagua Blazer no hizo ningún pago a Losada, él asumió la deuda, pagando la totalidad del precio del vehículo. Ante estos hechos, no podemos concluir que el entonces Alcalde de Bayamón haya obtenido alguna ventaja indebida en esta transacción que justifique se le encuentre en violación del Art. 3.3(b).

En cuanto al Alcalde de Ponce, concluimos que éste no violó el Art. 3.3(b). La Oficina estableció los hechos que constituían un caso *prima*

*facie* de violación al Art. 3.3(b): el Alcalde de Ponce compró para su residencia privada seis (6) aires acondicionados a una entidad que a su vez tenía contratos con el Municipio de Ponce.

No obstante, en el caso del señor Cordero Santiago, tampoco se alegó ni se demostró que hubiese obtenido algún beneficio económico, ventaja indebida, hubiese abusado de las facultades de su cargo, o hubiese en su actuación algún trazo de corrupción. Lo que sí surge del expediente del caso es que el señor Cordero Santiago admitió haber hecho el negocio y pagó por éste el precio del mercado. A la luz de los criterio esbozados en esta opinión, estos hechos no justifican que se encuentre al señor Cordero Santiago incurso en violación al Art. 3.3(b).

VII

En conclusión, no se alegó ni existe prueba en el expediente de que los Alcaldes de Ponce y Bayamón incurrieron en conducta que violara las disposiciones del Art. 3.3(b) de la Ley de Ética Gubernamental. Aunque la Oficina estableció los hechos que dan lugar a un caso *prima facie* de violación al Art. 3.3(b), no surge del expediente que se haya alegado ni presentado prueba a los efectos de que estos funcionarios hayan obtenido algún beneficio económico indebido, que hayan abusado de las facultades de su cargo, o que haya mediado algún acto de corrupción en las transacciones de negocios por ellos realizadas.

La evidencia en récord demuestra que tanto el señor Cordero Santiago como el señor Rivera realizaron sus respectivas transacciones pagando el precio del mercado, y asumiendo las deudas contraídas en su carácter personal sin comprometer en modo alguno fondos públicos. Ante estos hechos, es preciso concluir que no se demostró que estos funcionarios incurrieran en violación a la Ley de Ética Gubernamental.

En cuanto a la infracción de Art. 4.4(12) imputada al Alcalde de Ponce, concluimos que de la evidencia que obra en el expediente no surge claramente que el Alcalde tenía el deber legal de incluir la compra de

los aires acondicionados en el informe financiero, ya que no se puede determinar conforme a la factura que todas o alguna de las consolas de aires excedían del valor de mil (1,000) dólares. Por lo tanto, no puede sostenerse que violó el Art. 4.4(12) de la Ley de Ética Gubernamental.

Por estas razones, se confirma la sentencia del Tribunal de Circuito en la cual se determinó que el señor Ramón Luis Rivera no violó el Art. 3.3(b) de la Ley de Ética; y se revoca la sentencia dictada por el Tribunal de Circuito en la cual se determinó que el señor Rafael Cordero Santiago incurrió en violaciones a los Arts. 3.3(b) y 4.4(12) de la Ley de Ética Gubernamental.

El Juez Presidente, señor Andréu García y el Juez Asociado señor Hernández Denton estuvieron conformes con la Opinión y sentencia en su totalidad. A estos efectos, el Juez Hernández Denton emitió una Opinión de conformidad. El Juez Asociado señor Rebollo López concurre con el resultado al que se llega en la sentencia emitida por el Tribunal en los casos consolidados de epígrafe; esto es, entiende que ni el Alcalde Hon. Rafael Cordero Santiago ni el ex Alcalde Hon. Ramón Luis Rivera infringieron disposición legal alguna. El Juez Asociado señor Fuster Berlingeri emitió Opinión de conformidad en parte y concurrente con el resultado en cuanto a que los alcaldes en cuestión no violaron el Art. 3.3(b) de Ley de Ética Gubernamental, haciendo constar que no está de acuerdo con los pronunciamientos de la opinión y sentencia en el acápite VI-C. El Juez Corrada del Río emitió una Opinión concurrente en cuanto al Art. 3.3(b), por entender que el mismo es inconstitucional, a la cual se unió el Juez Asociado señor Rivera Pérez.

Se dictará sentencia de conformidad.


                              Miriam Naveira de Rodón
                                  Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Oficina de Ética Gubernamental

    Recurrida

                                   CC-1998-68

        v.

Hon. Rafael Cordero Santiago

    Peticionario

_____

Oficina de Ética Gubernamental

    Peticionaria

                                   CC-1999-144

        v.

Hon. Ramón Luis Rivera

    Recurrido

SENTENCIA

San Juan, Puerto Rico, a 21 de agosto de 2001

    Por los fundamentos expuestos en la Opinión que antecede, y por estar una mayoría de este Tribunal conforme con lo expuesto en los acápites I y II, el Juez Presidente señor Andréu García, la Juez Asociada señora Naveira de Rodón y los Jueces Asociados señores Hernández Denton, Fuster Berlingeri, Corrada del Río y Rivera Pérez, se revoca la sentencia de Tribunal de Circuito de Apelaciones que encontró al Alcalde de Ponce, señor Rafael Cordero Santiago, incurso en violación al Art. 4.4(12) de la Ley de Ética Gubernamental. El Juez Asociado señor Rebollo López concurre con el resultado.

    Además, por estar una mayoría de este Tribunal conforme con lo expuesto en los acápites III al V, el Juez Presidente señor Andréu García, la Juez Asociada señora Naveira de Rodón y los Jueces Asociados señores Hernández Denton y Fuster Berlingeri, y por concurrir todos los miembros del Tribunal con la conclusión de que los señores Cordero Santiago y Ramón Luis Rivera no violaron el Art. 3.3(b) de la Ley de Ética Gubernamental, se revoca la sentencia dictada por el Tribunal de Circuito de Apelaciones que determinó que el Alcalde Rafael Cordero Santiago incurrió en violación al Art. 3.3(b), y se confirma el dictamen del Tribunal de Circuito de Apelaciones que concluyó que el señor Ramón Luis Rivera no violó el Art. 3.3(b) de la Ley de Ética Gubernamental.

    Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Andréu García y el Juez Asociado señor Hernández Denton estuvieron conformes con la Opinión y sentencia en su totalidad. A estos efectos, el Juez Asociado señor Hernández Denton emitió Opinión de conformidad. El Juez Asociado señor Rebollo López concurre con el resultado por entender que ni el Alcalde

Hon. Rafael Cordero Santiago ni el ex alcalde Hon. Ramón Luis Rivera infringieron disposición legal alguna. El Juez Asociado señor Fuster Berlingeri emitió Opinión de conformidad en parte y concurrente en parte. El Juez Asociado señor Corrada del Río emitió Opinión concurrente a la cual se une el Juez Asociado señor Rivera Pérez.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Oficina de Etica Gubernamental
    Recurrida

        vs.

Hon. Rafael Cordero Santiago
-----------------------------
                                    CC-1998-68     Certiorari
Oficina de Etica Gubernamental      CC-1999-144
    Peticionaria

        vs.

Hon. Ramón Luis Rivera
    Recurrido

Opinión de Conformidad emitida por el Juez Asociado señor Hernández Denton

San Juan, Puerto Rico, a 21 de agosto de 2001.

*"Corruption, the most infallible symptom of constitutional liberty."*
Edward Gibbon, The Decline and Fall of the Roman Empire.

Uno de los cánceres más perniciosos que puede invadir al Estado moderno es la corrupción gubernamental. La misma estrangula la voluntad del pueblo y pone en peligro la integridad misma de la democracia. Desvincula y enajena las fuentes de legitimidad del poder del Estado de la acción y el efecto del mismo. Por esto, nuestro ordenamiento jurídico, con amplia sabiduría, aborrece al funcionario corrupto.

Por otro lado, no debemos olvidar que, en nuestro afán de eliminar la corrupción gubernamental, no podemos despreciar las garantías constitucionales que protegen a todo ciudadano. Envenena, también, y corroe lo más valioso de nuestro sistema democrático, el ataque desmesurado del Estado a los derechos fundamentales del individuo. Por esto, antes de privar a un ciudadano de su propiedad o de su libertad se requiere fiel cumplimiento con el más riguroso debido proceso de ley.

Las controversias de autos requieren que establezcamos un delicado balance entre la protección de los derechos de los individuos, y la necesidad de detener y castigar las violaciones éticas en que incurren algunos funcionarios públicos. Nos toca, pues, interpretar la Ley de Etica Gubernamental de manera tal que se protejan las libertades constitucionales que deben florecer en nuestra democracia, tanto de los actos de corrupción, como de la mano excesivamente dura de un gobierno justiciero. La rigurosidad al batallar la corrupción y demás males de nuestra sociedad no se puede tornar en inquisición.

Entendemos que la decisión mayoritaria llega a una solución acertada en los casos de autos y, por tanto, estamos conformes con los acápites I al V de la misma, que constituyen la Opinión del Tribunal. Además estamos también conformes con las partes VI y VII de la Opinión emitida por la Juez Asociada señora Naveira de Rodón, las cuales fueron endosadas por una pluralidad de los compañeros Jueces. No obstante, dada la importancia de la Ley de Etica Gubernamental en la realidad social puertorriqueña de hoy en día, hemos decidido suscribir esta Opinión de Conformidad para expresar nuestros criterios sobre las disposiciones de dicha Ley que hoy interpreta esta Curia por primera vez.

I

La Ley de Etica Gubernamental establece múltiples prohibiciones que limitan la conducta de los funcionarios y empleados públicos. Existen, sin embargo, distintos tipos de sanciones que se pueden

imponer al funcionario o empleado que viola sus disposiciones. El tipo de sanción a imponerse depende de la manera o modalidad en la cual se incurrió en tal violación. Dependiendo de la conducta específica del funcionario o empleado, puede que proceda una u otra de las distintas sanciones disponibles.

Nos parece crucial, pues, hacer un análisis de los distintos tipos de penalidades que se pueden imponer a un funcionario que viola las prohibiciones del Art. 3.3(b) de la Ley de Etica Gubernamental, y lo que se tiene que probar en cada caso para imponerlas. La prohibición establecida en el Art. 3.3(b), y la interpretación de lo que en dicho Artículo se dispone, es independiente de los distintos tipos de sanciones que se pueden imponer por su violación. Cada una de estas sanciones requiere un grado de culpabilidad y/o un procedimiento distinto que corresponda a su nivel de severidad.

Es decir que, al analizar la actuación de un funcionario público, primero se debe decidir si dicha actuación violentó la prohibición establecida en el Artículo específico de la Ley de Etica Gubernamental. Si este es el caso, entonces se debe determinar el elemento subjetivo, el grado de culpabilidad del funcionario, para así decidir qué sanción, si alguna, se debe imponer. No toda violación literal de las prohibiciones de la Ley debe resultar en sanciones, sino sólo aquellas que impliquen cierto grado de culpabilidad. De esta manera se cumple con el claro propósito de la Ley: combatir la corrupción, el uso de influencias indebidas, y el saqueo de la confianza del pueblo en un gobierno que actúa para el beneficio personal de sus funcionarios, en lugar del beneficio del pueblo.

II

Conforme lo anterior, lo primero que debe determinar la Oficina de Etica Gubernamental en casos como los de autos es si hay una violación literal del Artículo 3.3(b). Dicho Artículo dispone:

> Ningún funcionario o empleado público aceptará un empleo o mantendrá relaciones contractuales de negocio, con una persona, negocio o entidad que esté reglamentada por o que

haga negocios con la agencia gubernamental para la cual él trabaja cuando el funcionario o empleado público participe en las decisiones institucionales de la agencia o tenga facultad para decidir o influenciar las actuaciones oficiales de la agencia que tengan relación con dicha persona, negocio o entidad. 3 L.P.R.A. sec. 1823(b).

Del texto de la prohibición surgen dos de los elementos más importantes que se deben probar al establecer una violación: 1) que el funcionario acepte o mantenga relaciones contractuales con una entidad que esté reglamentada o que haga negocios con la agencia, y 2) que el funcionario participe en las decisiones institucionales de la agencia o tenga facultad para decidir o influenciar las actuaciones oficiales de la agencia que tengan relación con dicha entidad. Entendemos que hay tres señalamientos importantes que debemos hacer al respecto.

En primer lugar, debemos recalcar que la interpretación de "relaciones contractuales" que hace la decisión mayoritaria en esta ocasión es una amplia y abarcadora. **Toda** relación contractual cubierta bajo la "doctrina general de contratos según establecida por el Código Civil de Puerto Rico y la jurisprudencia" queda cubierta bajo la prohibición. Véase Opinión de la Juez Asociada señora Naveira de Rodón en la pág. 21. Esto implica que un alcalde de un pueblo pequeño, que compra materiales para hacer mejoras en su casa en la única ferretería del pueblo, estaría violando las prohibiciones del Artículo 3.3(b) si el municipio también compra materiales en dicha única ferretería.

De igual manera, en el caso de funcionarios de agencias que regulan ciertas áreas, esta interpretación de la Ley implica que si el Secretario de Salud decide atenderse en un hospital (entidad que el Departamento de Salud regula), estaría violando la prohibición literal del Artículo 3.3(b). También constituiría una violación a dicho Artículo el que el Comisionado de Seguros compre una póliza para asegurar su hogar o su automóvil de un agente o compañía regulada por la Oficina del Comisionado de Seguros.

Por esto precisamente es que se hace de tan crucial importancia que, al momento de imponer sanciones, se requiera un grado de

culpabilidad de parte del funcionario. De no ser así, se desvirtuaría el propósito claro de la ley (combatir la corrupción), y se podría tornar la misma en un instrumento para la persecución política.

En segundo lugar, se debe recordar que para establecer una violación al Artículo 3.3(b) se tiene que probar que el funcionario participa en las decisiones de la agencia o tiene facultad para influenciar sus actuaciones. En los casos de autos, la influencia de los alcaldes estaba claramente establecida ya que, como menciona la decisión mayoritaria, son estos funcionarios los que tienen la facultad de imprimirle efectividad a los contratos del municipio mediante su firma. En esta ocasión, pues, la determinación de si había facultad para influenciar las decisiones de la agencia era de fácil solución. Prevemos, sin embargo, que en otros casos esta interrogante puede ser objeto de un más extendido y riguroso análisis.

Por último, cabe destacar que la prohibición del Artículo 3.3(b) aplica sólo cuando el funcionario puede influir en decisiones **que estén relacionadas a la entidad con la que mantiene relaciones contractuales.** De esta manera nos aseguramos que sólo se castigue a aquel funcionario que pueda obtener beneficios a cambio de influencias indebidas. Este tipo de comportamiento, corrupto y antiético, es el único que la Ley está destinada a castigar.

III

Una vez se ha establecido una violación a las prohibiciones literales corresponde determinar el grado de culpabilidad en que incurrió el funcionario, para así decidir qué sanciones, si algunas, se deben imponer. Luego de analizar detenidamente las disposiciones pertinentes, hemos concluido que existen tres tipos de sanciones: 1) sanciones administrativas que provee la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. sec. 2201; 2) sanciones civiles que provee la Ley de Etica Gubernamental, 3 L.P.R.A. sec. 1828(b); y 3) sanciones penales que provee la Ley de Etica Gubernamental, 3 L.P.R.A.

sec. 1828(a).[29] Entendemos que cada tipo de sanción responde a un nivel de culpabilidad y/o a un procedimiento distinto.

A.

En primer lugar, en cuanto a las sanciones administrativas, la decisión mayoritaria correctamente concluye que se pueden imponer cuando un funcionario viole las prohibiciones del Art. 3.3(b), y no pueda probar que dicha violación no iba atada a un beneficio económico o una influencia indebida. Es decir, cuando se prueba que un funcionario con facultad para decidir o influenciar las acciones de la agencia mantuvo relaciones contractuales con una persona, entidad o negocio que la agencia regula, o con el cual mantiene relaciones contractuales, se establece un caso *prima facie* de violación ética que conlleva sanciones administrativas.

Sin embargo, el funcionario puede presentar como defensa afirmativa la ausencia de beneficio económico o influencia indebida. Al proveer esta defensa, nos aseguramos que la Ley de Etica Gubernamental sólo se aplique contra aquellos funcionarios corruptos que **intenten beneficiarse personalmente de su posición de poder**. Como discute y explica muy convincentemente la decisión mayoritaria, éste es el único tipo de conducta que pretende castigar la Ley. Entendemos, sin embargo, que no tiene que haberse materializado el beneficio económico, sino que la intención de beneficiarse o de ejercer influencia indebida es suficiente. No puede constituir una defensa del funcionario malintencionado el que su plan sea frustrado antes de que rinda sus frutos podridos.

Cabe recalcar que las sanciones administrativas surgen de las disposiciones de la Ley de Procedimiento Administrativo Uniforme.[30] Como

---

[29] Las sanciones "civiles" provistas por la Ley de Etica Gubernamental son también sanciones de tipo administrativo. Sin embargo, nos referiremos a ellas como sanciones "civiles" para así diferenciarlas de las sanciones administrativas provistas por la Ley de Procedimiento Administrativo Uniforme.

[30]      "Toda violación a las leyes que administran las agencias o a los reglamentos emitidos al amparo de las mismas podrá ser penalizada con multas administrativas que no excederán de cinco mil (5,000) dólares por cada violación.

En caso de que la ley especial de que se trate sólo provea penalidades criminales, el jefe de la agencia, a su opción, podrá radicar una querella administrativa al amparo de esta sección para procesar el caso por la vía administrativa.

Si la ley especial de que se trate dispone una penalidad administrativa mayor a la que se establece en esta sección, la agencia podrá imponer la penalidad mayor." 3 L.P.R.A. sec. 2201.

tal, dichas sanciones están limitadas a $5,000.00 por cada violación. 3 L.P.R.A. sec. 2201. Esto no impide, sin embargo, que se impongan también las sanciones civiles y penales que provee la Ley de Etica Gubernamental. Id.

### B.

Por otro lado, al imponer las sanciones civiles que provee la Ley de Etica, es necesario probar que hubo un beneficio económico como resultado de la violación. 3 L.P.R.A. sec. 1828(b)(3).[31] Esto surge del texto claro de la Ley, ya que la cuantía de las sanciones es igual al triple del beneficio económico. Id. Si no hubo beneficio, pues, no procede imponer sanciones civiles. A diferencia de las sanciones administrativas, estas sanciones civiles sólo se pueden imponer cuando se ha materializado algún beneficio económico, y su cuantía está atada estrictamente a dicho beneficio. Así pues, sirven como un cierto tipo de pena de restitución, aún cuando al triplicarse la cuantía también sirvan como medida punitiva.

### C.

Por último, tenemos las sanciones penales. Entendemos que el imponer sanciones penales debe requerir, también, que haya habido un beneficio económico indebido. Entendemos además que la Ley de Etica exige que se pruebe, **como elemento del delito**, que la violación del Art. 3.3(b) haya sido intencional. El Art. 3.8 de dicha ley dispone: "Toda persona que viole **intencionalmente** las prohibiciones y disposiciones establecidas en [el Art. 3.3(b)] incurrirá en delito grave y convicta que fuere, será sancionada por cada violación con pena de reclusión por un término fijo de un año o con multa de dos mil ($2,000) dólares; o ambas penas a discreción del tribunal." 3 L.P.R.A. sec. 1828(a)(1) (*énfasis suplido*).

Por lo tanto, el delito tipificado en dicho artículo incluye un elemento subjetivo de intención. Surge claramente del texto de la Ley

---

[31] "Toda persona que reciba un beneficio económico como resultado de la violación de este subcapítulo vendrá obligado a pagar al Estado como sanción civil por su incumplimiento una suma equivalente a tres (3) veces el valor del beneficio económico recibido." 3 L.P.R.A. sec. 1828(b)(3).

de Etica que el funcionario que viola el Art. 3.3(b) sólo incurre en conducta criminal si lo hace intencionalmente, es decir si **sabe** que está manteniendo relaciones contractuales con una persona, entidad o negocio a la cual la agencia regula, o con la cual mantiene relaciones contractuales. Por ser la intención uno de los elementos del delito, el peso de probar que dicho elemento subjetivo existió recae sobre el fiscal.

Por otro lado, la ley no menciona explícitamente, al definir el delito, la necesidad de probar que hubo un beneficio económico o una influencia indebida. Sin embargo, entendemos que surge del historial legislativo que la ley estaba destinada a criminalizar conducta corrupta que incluyera este tipo de beneficio indebido. El elemento subjetivo que incluye la Ley de Etica Gubernamental al tipificar el delito grave debe requerir una disposición mental corrupta que vaya en busca de un beneficio indebido. Esto constituye un elemento del delito y debe ser probado por el fiscal, más allá de toda duda razonable, **en un procedimiento criminal** donde el acusado tendrá derecho a juicio por jurado y a todas las demás garantías que exige el debido proceso de ley. Además, el hecho que la Asamblea Legislativa haya requerido prueba de un beneficio económico indebido al imponer **sanciones civiles** hace forzoso concluir que dicha prueba debe ser requerida también al imponer **sanciones penales que pueden conllevar encarcelamiento, sin beneficio de sentencia suspendida, por un delito grave.**

Cabe mencionar que queda bajo la discreción de la Oficina de Etica Gubernamental el decidir preliminarmente qué sanciones amerita una violación de la Ley. Dicha Oficina no tiene que referir al fiscal toda violación intencional de la Ley en la que haya habido un beneficio económico indebido para que se instituya el correspondiente procedimiento criminal. La Oficina de Etica Gubernamental puede optar, en casos donde haya factores atenuantes, por sólo imponer sanciones administrativas y/o sanciones civiles. Este tipo de discreción, análoga a la discreción de la cual gozan los fiscales al decidir si instar

procedimientos criminales, debe servir de saludable balance a la severidad de las sanciones penales establecidas en la Ley.

IV

"Nay, but to live
*In the rank sweat of an enseaméd bed,*
*Stewed in corruption, honeying and making love*
*Over the nasty sty."*
William Shakespeare, <u>Hamlet</u>, Act 3, Scene 4.

Puerto Rico se ha visto arropado por telarañas de corrupción gubernamental que parecen saltar a nuestro paso, inesperadas e inexorables, envolviendo en confusión nuestro proceder y deslizándose, macabras, por nuestra piel como las babas del diablo. Ante esta situación tan alarmante que amenaza la legitimidad misma de nuestros líderes electos, y la viabilidad de nuestro sistema democrático, se tiene que responder de manera agresiva e implacable. No podemos permitir que se debilite la médula ética de los funcionarios que cimientan nuestro sistema constitucional con su integridad y servicio. Tal descuido podría conllevar una implosión masiva de nuestro ordenamiento democrático.

Sin embargo, no podemos olvidar que también se corroe el tuétano de una democracia cuando el Estado acecha y amenaza las libertades constitucionales de sus individuos. No podemos perder el justo juicio y el sentido común en nuestro afán de imponer orden. No puede haber justicia sin orden, pero mucho menos orden sin justicia. Una saludable limpieza de las instituciones públicas del país no puede, bajo ningún concepto, convertirse ni en cruzada despavorida, ni en cacería de brujas, ni en entrampamiento político.

Como discute la decisión mayoritaria, los casos de autos presentan una situación en la cual se le impusieron sanciones administrativas a los Honorables Rafael Cordero Santiago y Ramón Luis Rivera. No se les proveyó a dichos alcaldes una oportunidad de presentar como defensa la ausencia de beneficio económico o influencia indebida. Estos casos ilustran las injusticias que se pueden cometer contra funcionarios que

inocentemente violan las disposiciones literales de la Ley de Etica Gubernamental en el curso regular de sus transacciones como consumidores. Del expediente surge que estos alcaldes no recibieron ningún tipo de beneficio económico indebido ni abusaron de su posición de poder. Por lo tanto, sería injusto imponerles sanciones y someterlos al desprecio público por actos que no reflejan el más mínimo grado de culpabilidad.

Coincidimos, además, con el criterio mayoritario con respecto a la inaplicabilidad a los casos ante nos de la doctrina de amplitud excesiva. Por otro lado, y por los mismos argumentos anteriormente expuestos en cuanto a la interpretación del Artículo 3.3(b), estamos convencidos que la metodología utilizada en la decisión mayoritaria para interpretar el Art. 4.4(12), que le provee al funcionario una oportunidad para explicar por qué no incluyó alguna información en el informe que dicho Artículo requiere, es la más correcta y sabia. Estamos, pues, conformes con la decisión mayoritaria en su totalidad.


Federico Hernández Denton
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

```
                                    *
Oficina de Ética Gubernamental      *
                                    *
       Recurrida                    *
                                    *
              vs.                   *          CC-1998-68
                                    *
Hon. Rafael Cordero Santiago        *
                                    *
       Peticionario                 *
                                    *
- - - - - - - - - - - - - - - - - - *
                                    *
Oficina de Ética Gubernamental      *
                                    *
       Peticionaria                 *
                                    *
              vs.                   *          CC-1999-144
                                    *
Hon. Ramón Luis Rivera              *
                                    *
       Recurrido                    *
                                    *
* * * * * * * * * * * * * * * * * *
```

Opinión de Conformidad en Parte y Concurrente en Parte emitida por el Juez Asociado señor FUSTER BERLINGERI.

San Juan, Puerto Rico, a 21 de agosto de 2001.

Estoy conforme con lo expresado en los acápites I a V de la opinión emitida en estos casos. Concurro, además, con la mayoría del Tribunal en cuanto al **resultado** de estos casos en lo relativo al Art. 3.3(b) de la Ley de Ética Gubernamental, aunque lo hago por una razón distinta a las que fundamentan el dictamen de la mayoría sobre el particular.

En los casos de autos, las conductas impropias imputadas a los alcaldes en cuestión como violatorias del Art. 3.3(b) referido ocurrieron ambas en **1991**. A esa fecha

no se había aprobado aún el Reglamento de Ética Gubernamental que **expresamente** prohíbe cualquier acción de un servidor público que tenga la **apariencia** de ser impropia. Tampoco se habían realizado las enmiendas de 1994 a la Ley de Ética Gubernamental que tuvieron como fin prohibir las relaciones contractuales privadas entre los servidores públicos y las empresas contratadas por el Gobierno en las cuales pudiese existir algún **posible** conflicto de interés. Dichas enmiendas tenían el propósito claro de prohibir incluso el conflicto de interés **aparente**.

En vista de lo anterior, y sólo por ello, estimo que no procede concluir que los alcaldes en cuestión violaron el Art. 3.3(b) de la Ley referida. Aunque los casos de autos involucran a dos experimentados alcaldes que han estado por muchos años en la palestra pública, por lo que debían conocer bien al menos la imprudencia de la conducta que realizaron, el hecho jurídico es que dicha conducta no estaba **claramente prohibida** cuando éstos la realizaron. Por consideraciones elementales del debido proceso de ley, no puede **multárseles** ahora por su cuestionable proceder. Por ello, coincido con el resultado que ordena la mayoría del Tribunal aquí.

Debo hacer hincapié, sin embargo, en que no puedo estar de acuerdo con lo sostenido por tres de los Jueces de este Tribunal en el acápite VI-C de la opinión de que incurrir en una conducta que aparenta ser impropia no puede, por sí sólo, constituir una violación de la ética gubernamental. Sobre todo, rechazo vehementemente la interpretación que se hace por dichos tres Jueces de nuestra jurisprudencia relativa al deber de los abogados de evitar hasta la apariencia de la conducta impropia.

El Estado tiene razones muy importantes y muy legítimas para prohibir sólo la apariencia de conducta impropia. Es decir, aunque el funcionario público al que se le imputa tal proceder no haya disfrutado de "ventajas indebidas" o "beneficios personales" por tal conducta ni ésta sea constitutiva de "corrupción" o de "abuso de poder", el Estado

puede prohibir la mera apariencia de conducta impropia y sancionar al que sólo ha incurrido en tal apariencia. Ello es así porque en aras de proteger la indispensable confianza pública en los procesos gubernamentales, el Estado puede exigirle a los servidores públicos no sólo que actúen correctamente siempre en el desempeño de sus cargos sino además que eviten también aquellas situaciones que pueden razonablemente conducir al público a suponer que el funcionario gubernamental ha actuado impropiamente. Ello es particularmente cierto en nuestra época, cuando cunde la sospecha en torno a todo proceder gubernamental que no sea enteramente transparente, debido a los numerosos actos de taima y corrupción que ha sufrido la administración pública del país en años recientes. El Estado ciertamente puede tratar de ponerle coto a la creciente desilusión y desconcierto de la gente respecto al gobierno, exigiéndole al servidor público que evite hasta la apariencia de la conducta impropia.

Así lo hemos hecho hasta ahora nosotros mismos con respecto a la profesión jurídica, en aras de proteger la indispensable confianza pública en la administración de la justicia. Contrario a lo que ahora afirman tres Jueces del Tribunal en la opinión para los casos de autos, nosotros sí hemos sancionado a abogados por realizar conducta que aparentó ser impropia, aunque en efecto dicha conducta de por sí no hubiese constituido una violación ética independiente. Véase, In re Toro Cubergé, 140 D.P.R. 523 (1996); In re Colón Ramery, 138 D.P.R. 793 (1995); In re Belén Trujillo, 126 D.P.R. 743 (1990); Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172 (1985); In re Carreras Rovira y Suárez Zayas, 115 D.P.R. 778 (1984); In re Valentín González, 115 D.P.R. 68 (1984); In re Rojas Lugo, 114 D.P.R. 687 (1983); In re Concepción Suárez, 111 D.P.R. 486 (1981); In re Roldán Figueroa, 106 D.P.R. 4 (1977); In re Rodríguez Torres, 104 D.P.R. 758 (1976).

Que el Estado pueda prohibir aun la apariencia de la conducta impropia no significa, claro está, que la Oficina de Etica Gubernamental no deba tomar en cuenta las circunstancias particulares

de cada caso, **<u>a los fines de determinar la sanción que deba aplicarse</u>**. Es obvio que no todas las violaciones de la ética gubernamental son de igual gravedad. Es posible que en algunos casos existan circunstancias atenuantes que justifiquen imponer sólo una amonestación inicialmente. Lo que no es aceptable es que se abra la puerta a que aquellos funcionarios públicos que otorgan contratos importantes a empresas privadas continúen de ordinario haciendo negocios personales con esas mismas empresas. Tal práctica indudablemente levanta sospechas públicas que deben evitarse, sobre todo cuando existen otras empresas comerciales que pueden prestar al funcionario público el mismo servicio privado en iguales condiciones que la empresa que tiene también el contrato gubernamental.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Oficina de Ética Gubernamental

    Recurrida

       v.

    Rafael Cordero Santiago            CC-1998-68

    Recurrente
                          CERTIORARI Oficina
de Ética Gubernamental

    Peticionaria              CC-1999-144

       v.

           Ramón Luis Rivera

          Recurrido

Opinión Concurrente emitida por el Juez Asociado señor Corrada del Río

San Juan, Puerto Rico a 21 de agosto de 2001.

La erradicación de la corrupción gubernamental y el aseguramiento de un gobierno caracterizado por una ética de excelencia son fines altamente meritorios, para lo cual la Asamblea Legislativa promulgó la Ley de Ética Gubernamental.[32] No obstante, la consecución de estos propósitos no justifica que se violen las protecciones y garantías constitucionales de los funcionarios de gobierno.

### CASO CC-1998-68

En el recurso CC-1998-68 el alcalde del Municipio de Ponce, Hon. Rafael Cordero Santiago, solicita la revisión de la sentencia emitida por el Tribunal de Circuito de

---

[32] Ley Núm. 12 de 24 de julio de 1985, según enmendada, 3 L.P.R.A. secs. 1801 *et seq.*

Apelaciones el 25 de noviembre de 1997. Ésta modificó en parte la resolución emitida por la Oficina de Ética Gubernamental (en adelante "la Oficina de Ética"), que le impuso al alcalde unas multas por violaciones a la Ley de Ética Gubernamental (en adelante "Ley de Ética").

El tribunal apelativo modificó la resolución para reducir el monto de las multas impuestas, pero sostuvo las violaciones a la Ley de Ética.

Luego de examinar el recurso del Alcalde de Ponce, declararíamos inconstitucional el artículo 3.3(b) de la Ley de Ética, 3 L.P.R.A. sec. 1823(b), tal y como estaba vigente al momento de ocurrir los hechos en este caso, y como consecuencia revocaríamos el dictamen del foro apelativo en cuanto a la violación a dicho artículo.

I

Durante el período de 1989 a 1995, el Municipio de Ponce (en adelante "el Municipio") realizó negocios con la firma Dominicci Air Conditioning (en adelante "Dominicci") con el propósito de que dicha firma le vendiera e instalara unas unidades de acondicionadores de aire. Estos negocios se formalizaron a través de la Junta de Subastas del Municipio de Ponce, luego se enviaron a la División Legal de dicho municipio y por último se remitió el contrato al alcalde para su firma.[33]

El 23 de noviembre de 1991, el alcalde compró a Dominicci seis (6) consolas de acondicionadores de aire para instalarlas en su residencia privada.[34] El precio de las consolas montó a un total de $6,811.00 y su adquisición no fue incluida por el alcalde en el informe financiero correspondiente al año 1991. No

---

[33] El alcalde delegó la Presidencia de la Junta de Subastas, por lo que no intervino en la adjudicación de las subastas.

[34] La factura correspondiente a la compra de las consolas fue firmada por la esposa del alcalde y por el Sr. Nelson Dominicci.

se alega que el precio pagado fuera irrazonable o por debajo del justo valor de la mercancía comprada.

El 8 de febrero de 1996, la Oficina de Ética presentó una querella contra el alcalde por violar las disposiciones de la Ley de Ética. Se alegó específicamente que:

> 9. El Alcalde de Ponce mantuvo **relaciones de negocio** con Dominicci Air Conditioning, entidad que hace a su vez negocios con el municipio en violación al Artículo 3.3(b) de la Ley de Ética Gubernamental, antes citada. (Enfasis nuestro).
> 10. El querellado está impedido de llevar a cabo el negocio privado con Dominicci Air Conditioning, según lo dispone el artículo 3.3(b)...
> 11. ....
> 12. ....
> 13.El querellado omitió en el informe financiero del 1991, la compra de los sistemas de aire acondicionados a Dominicci Air Conditioning para su residencia privada.

Luego de celebrada una vista administrativa, la Oficial Examinadora recomendó que se le impusiera al alcalde una multa administrativa de $4,000.00 por haber incurrido en violación a los artículos 3.3(b) y 4.4(12) de la Ley de Ética. No obstante, el Director Ejecutivo, Lcdo. Héctor A. Feliciano Carreras, aumentó la multa por ambas violaciones a la suma de $6,000.00.

Inconforme con la determinación de la Oficina de Ética, el alcalde recurrió mediante recurso de revisión al Tribunal de Circuito de Apelaciones. Alegó que las multas impuestas eran ilegales y contrarias a derecho. Alegó además, que la Oficina de Ética había errado al concluir que él podía influenciar las actuaciones oficiales del municipio con Dominicci y que el artículo 4.4(12) era inconstitucional por ser excesivamente amplio.

El 25 de noviembre de 1997, el tribunal apelativo emitió sentencia, notificada y archivada en autos el 26 de noviembre de 1997, confirmando la resolución de la Oficina de Ética, pero modificó la multa disminuyéndola de $6,000.00 a $2,000.00, por considerar que era excesiva.

Oportunamente, el alcalde recurrió ante nos aduciendo que cometió error el tribunal apelativo al:

A. [C]onfirmar la determinación de la Oficina de Ética Gubernamental de que la adquisición de unos equipos de aire acondicionado por su justo precio constituye una violación al artículo 3.3(b) de la Ley de Ética Gubernamental cuando dicho precepto es ambiguo e impreciso o no penaliza tal actuación.

B. [C]onfirmar la determinación de la Oficina de Ética Gubernamental que resolvió que el querellado había quebrantado las disposiciones del Artículo 4.4(12) de la Ley de Ética Gubernamental y todo ello no obstante la patente y manifiesta inconstitucionalidad del precepto en cuestión por razón de su excesiva amplitud ("overbreadth"), su vaguedad en razón a que sus prohibiciones no están claramente definidas y la injustificada invasión y menoscabo que el referido artículo entraña al derecho a la privacidad e intimidad del querellado, sin equivalente valor redentor.

Posteriormente la Oficina de Ética compareció mediante "Oposición a que se Expida el Auto de *Certiorari",* y sostuvo que la resolución de esa agencia y la sentencia del tribunal apelativo eran correctas al concluir que el alcalde había incurrido en conducta violatoria de la Ley de Ética, y que las disposiciones de dicha ley eran constitucionales.

Por otra parte, la Asociación de Alcaldes de Puerto Rico, solicitó comparecer como *amicus curiae* y presentó su memorando al respecto, exponiendo esencialmente que el artículo 3.3(b) de la Ley de Ética es inconstitucional por razón de vaguedad.

El 24 de abril de 1998[35] expedimos el auto solicitado y aceptamos la comparecencia de la Asociación de Alcaldes como *amicus curiae.*

El 18 de junio de 1998, el Procurador General compareció mediante su informe amparándose en la autoridad que le confiere la Regla 21.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III.[36] En

---

[35] Esta Resolución lleva por error fecha de 24 de marzo de 1998.

[36] "Siempre que la constitucionalidad de una ley...del Estado Libre Asociado de Puerto Rico se

**continúa**...

dicho    informe    sostiene    la    constitucionalidad    de    las
disposiciones de la Ley de Ética. Veamos.

II

La    Ley    de    Ética    Gubernamental    disponía,    antes    de    ser
enmendada en 1994, que ningún funcionario público aceptará un
empleo  o  relaciones  contractuales  de  negocio  con  una  persona,
negocio o entidad que esté reglamentada por o que haga negocios
con la agencia gubernamental para la cual él trabaja cuando el
funcionario  participe  en  las  decisiones  institucionales  de  la
agencia  o  tenga  facultad  para  decidir  o  influenciar  las
actuaciones  oficiales  de  la  agencia  que  tengan  relación  con
dicha persona, negocio o entidad. 3 L.P.R.A. sec. 1823, art.
3.3(b).[37]

Esta disposición contiene una serie de elementos, a saber:
(1) que se trate de  un  funcionario  público; (2)
que acepte un empleo o **relaciones contractuales de negocio**; (3)
con una persona o negocio que a su vez haga negocios con la
institución  para  la  cual  trabaja  el  funcionario;  (4)  que  el
funcionario participe en las decisiones institucionales o tenga
facultad para decidir o influenciar las actuaciones oficiales de
la institución que tengan relación con dicha persona o negocio.

En el caso ante nos, estamos ante la figura del Alcalde de
Ponce quien es un funcionario público sujeto a las exigencias de
la Ley de Ética. Además nos encontramos ante un funcionario que
tiene  facultad  para  decidir  o  influenciar  las  actuaciones
oficiales  del  municipio  en  relación  con  Dominicci,  ya  que  al
desempeñar  el  cargo  de  Alcalde  tiene  que  firmar  todos  los

---

[5] **...continuación**
impugnare  en  algún  pleito  en  que  éste  o  algún  funcionario  o
agencia  del  mismo  no  fuere  parte,  el  tribunal  ordenará  que  se
notifique  dicha  impugnación  y  permitirá  la  intervención  del
Estado Libre Asociado de Puerto Rico." 32 L.P.R.A. Ap. III, R.
21.3.

contratos que otorga la Junta de Subastas, aunque él no participe en el otorgamiento de la buena pro. Su participación en estos contratos, lejos de ser proforma como alega el peticionario, es de suma importancia ya que el primer ejecutivo municipal es quien nombra y confirma a los miembros de la Junta de Subastas y por lo tanto es responsable por las actuaciones de dichos miembros. Tan importante es su participación, que no es sino hasta que imprime su firma que dichos contratos nacen a la vida jurídica. Es forzoso concluir que el Alcalde de Ponce cumple con el primer y cuarto elemento del artículo 3.3(b) de la Ley de Ética.

El segundo y tercer elemento del Artículo 3.3(b) prohiben que el funcionario acepte relaciones contractuales de negocio con una persona o negocio que a su vez haga negocios con la institución para la cual trabaja el funcionario. Así, nos encontramos en el presente caso con la situación de que el Alcalde de Ponce compró unas unidades de acondicionadores de aire para su residencia a Dominicci, compañía que hacía negocios con el municipio de Ponce. Resulta claro que el Alcalde compró las unidades para su uso personal y que se las compró a Dominicci. Por lo tanto se cumple con el tercer elemento del artículo 3.3(b), pero resulta necesario determinar si la compra que se celebró está proscrita por la Ley de Ética por constituir la aceptación de relaciones contractuales de negocio y si dicha disposición adolece de vaguedad.

III

Es un principio básico del debido procedimiento que una ley es nula por vaguedad si sus prohibiciones no están claramente definidas. *Pacheco Fraticelli* v. *Cintrón*, 122 D.P.R. 229 (1988); *Vives* v. *Tribunal Superior,* 101 D.P.R. 139 (1973). La doctrina

[37] Este es el texto de la disposición vigente al momento de ocurridos los hechos del caso de autos.

de vaguedad es aplicable a todas las leyes penales y no sólo a aquéllas que reglamentan la expresión hablada o escrita, como ocurre con la doctrina de amplitud excesiva u "overbreadth".[38] A pesar de que ambas doctrinas tienen elementos en común, no debemos confundirlas. *U.N.T.S.* V. *Srio. de Salud*, 133 D.P.R. 153 (1993).

La doctrina de vaguedad encierra el requisito básico de dar información suficiente a la comunidad de cuáles son los actos que acarrean sanción penal. Los estatutos tienen que dar a una persona de ordinaria inteligencia la oportunidad razonable para saber qué está prohibido, de modo que pueda actuar en concordancia con ese conocimiento. *Pacheco Fraticelli* v. *Cintrón, supra; Vives* v. *Tribunal, supra.*[39] Además, las disposiciones de un estatuto deben proveer normas claras para aquéllos que las aplican, de manera que se prevenga la aplicación arbitraria o discriminatoria de la ley.

Hemos resuelto que una ley es inconstitucional por razón de vaguedad cuando: (a) una persona de inteligencia promedio no pueda comprender el acto u omisión que dicha ley quiso prohibir, (b) la ley se presta para ser aplicada de manera arbitraria y discriminatoria, y (c) interfiere con derechos fundamentales garantizados en la Constitución. *Pacheco Fraticelli* v. *Cintrón, supra.* El examen judicial a realizarse será determinar si el lenguaje de la ley da un aviso definido con respecto a la conducta prohibida u ordenada, de acuerdo al significado común y corriente y si lo hace de forma clara y precisa para que no propicie su aplicación arbitraria.[40]

---

[38] Raúl Serrano Geyls, <u>Derecho Constitucional de Estados Unidos y Puerto Rico</u>, San Juan, Ed.C.Abo.P.R., 1988, Vol. II, pág. 1323.

[39] Citando con aprobación a *Grayned* v. *City of Rockford*, 408 U.S. 104 (1972).

[40] Dora Neváres-Muñiz, <u>Código Penal de Puerto Rico</u>, San Juan, Ed.Rev.C.Abo.P.R., 1993, pág. 16.

El análisis de la doctrina de vaguedad ha sido extendido en Puerto Rico a las penalidades de tipo criminal. El concepto de vaguedad se relaciona íntimamente con el principio de *nullum crimen sine lege praevia*, que requiere que no sólo el delito sino la pena sean claramente definidas por ley. Art. 8 del Código Penal de P.R., 33 L.P.R.A sec. 3031. *U.N.T.S.* v. *Srio. de Salud, supra,* a la pág. 171, nota al calce 18. Este principio va unido también al mandato constitucional de que ninguna persona será privada de su libertad sin un debido proceso de ley. Art. II, Sec. 7, Constitución del Estado Libre Asociado de Puerto Rico.

La vaguedad de un estatuto penal puede consistir de incertidumbre en cuanto a qué persona cubre la ley, o incertidumbre en cuanto a la norma aplicable para determinar la culpabilidad. *Pueblo* v. *Hernández Colón*, 118 D.P.R. 891 (1987). Esto crea inconvenientes tanto para las personas a las cuales está dirigida la legislación, como para los encargados de velar por su cumplimiento. De primera instancia, porque no provee a personas de inteligencia promedio una guía adecuada que le aperciba de antemano que su conducta está prohibida.

En segundo lugar, delega impermisiblemente en los encargados de implementarla, la determinación del alcance de la legislación, prestándose así a una aplicación arbitraria y discriminatoria. *Pueblo* v. *Hernández Colón, supra.* En estos casos, la ley es inconstitucional de su faz no por la forma en que fue empleada en un caso en particular, sino por la multiplicidad de maneras inconsistentes y arbitrarias en que podría ser utilizada en otras ocasiones. *Id.* De igual forma, **cuando se utiliza lenguaje general, sin delimitarse adecuadamente, de manera que el estatuto proscribe no sólo la conducta que en efecto se desea castigar, sino que también prohibe conducta que podemos presumir**

**no se considera delictiva, estamos ante un estatuto nulo por vaguedad.** *Winters* v. *New York*, 333 U.S. 507, 516 (1947).

En el presente caso nos encontramos ante una disposición de la Ley de Ética que impone penas por incurrir en violaciones a sus preceptos, por lo cual se considera de carácter penal.[41] Por ello está sujeta a las limitaciones constitucionales y normas de interpretación aplicables a este tipo de legislación.

Según expusiéramos anteriormente, el artículo 3.3(b) de la Ley de Ética es de aplicación al alcalde de Ponce. Ahora bien, lo pendiente de dirimir es si el negocio jurídico celebrado por éste con Dominicci está cubierto por la prohibición de que "ningún funcionario público aceptará relaciones contractuales de negocio" con una entidad que hace negocios con la agencia de gobierno para la cual trabaja.

En la realización de esta tarea nos encontramos ante la dificultad de que dicha disposición no define qué son relaciones contractuales de negocio, ni ofrece guías para determinar qué tipo de transacciones están cubiertas. Es decir, la conducta proscrita no está claramente definida.

Bajo los criterios esbozados anteriormente, tenemos ante nos una conducta prohibida que no puede comprenderse

---

[41] Malavet Vega, <u>Manual de Derecho Penal Puertorriqueño</u>, Mayagüez, Ed. Barco de Papel, 1997, págs. 5-9.

con claridad por una persona de inteligencia promedio, y que además no provee normas claras para aquéllos encargados de aplicarla. Al no definirse adecuada y claramente la conducta proscrita, cabe preguntarse; ¿busca el artículo prohibir **toda relación contractual de negocios** realizada por un funcionario público con una institución que contrate con la entidad gubernamental? En este sentido, es menester tener presente que una entidad o persona que preste servicios a un municipio podría entrar en relaciones contractuales de negocio con un funcionario público sobre artículos necesarios y comunes al diario vivir.

Así, cuando un funcionario compra artículos tales como: vestimenta, alimentos, enseres domésticos o animales, entre otros, ¿estará violando el artículo 3.3(b) porque los compró en una institución que hace negocios con la agencia que dirige el funcionario? Más aún, ¿qué del municipio que tiene sus cuentas bancarias en la única sucursal de un banco sito en dicho municipio, y el alcalde tiene su cuenta personal en el mismo banco? ¿O qué tal si el alcalde posee una tarjeta de crédito emitida por dicho banco? Más allá de un alcalde de un pueblo, tomemos en consideración a un jefe de agencia. Dicha agencia tiene un contrato con una empresa gasolinera para que le supla gasolina a su flota de automóviles. ¿El jefe de agencia, se verá impedido de comprar gasolina a esa empresa para su automóvil privado o el de su familia? En todos estos supuestos cotidianos ¿incurren los funcionarios públicos en violación al artículo 3.3(b)? ¿Son éstas las relaciones contractuales que prohíbe el artículo 3.3(b), o se trata de otro tipo de relaciones contractuales? Definitivamente la ley no especifica.

A tenor, la lista de situaciones cotidianas donde se podría o no estar en violación de esta norma sería interminable, como interminable sería el número de situaciones absurdas que la

aplicación de este artículo produce debido a la vaguedad del mismo.

Según redactado el artículo 3.3(b), podemos interpretar que el término "relaciones contractuales de negocio" incluye todo contrato, desde la compra de artículos de poca monta necesarios para el diario vivir, hasta la compra de autos o de inmuebles.

Una vez concluimos que **todas las relaciones contractuales de negocio** celebradas según el artículo 3.3(b) estarían en violación del mismo, tenemos que colegir que la Oficina de Ética pudiera estar compelida a procesar a todos los funcionarios públicos que lleven a cabo dichas relaciones contractuales. Esto representa un problema al implantar la ley, ya que existe incertidumbre en cuanto a la norma aplicable para determinar la violación de ésta, lo que se presta para una aplicación arbitraria y discriminatoria. *Pueblo* v. *Hernández Colón*, *supra.* El criterio que utilice la Oficina de Ética para discernir cuáles violaciones podrían ser objeto de atención o cuáles no, podría constituir una aplicación arbitraria y discriminatoria del artículo 3.3(b).

Otra posible interpretación del artículo 3.3(b) es que "relaciones contractuales de negocio" se refiere solamente a relaciones comerciales continuas y no así a una relación contractual aislada y esporádica. Es decir, que el artículo sólo prohibe aceptar relaciones contractuales de tracto sucesivo. O que, dicha frase lo que proscribe es la prestación de servicios por contrato por parte del funcionario para con el negocio que a su vez le presta servicios a la agencia.

Lo cierto es que, como expusiéramos anteriormente, las posibilidades son muchas. Es patente que mentes objetivas y bien intencionadas pueden diferir respecto al alcance del artículo 3.3(b), de forma que se presta a conjeturas con respecto a la conducta prohibida por el estatuto. Después de todo, las

personas de inteligencia común y corriente no deben estar obligadas a adivinar en cuanto al significado de un estatuto. *Pueblo* v. *Hernández Colón, supra.*

Agrava la situación el hecho de que el artículo 3.3(b) utiliza lenguaje general sin limitaciones adecuadas. Esto nos confronta con un estatuto que proscribe no sólo la conducta que en efecto se desea castigar, sino también conducta que podemos presumir no se considera como prohibida, lo cual abunda a su vaguedad. *Winters* v. *New York, supra.*

Por último, es importante señalar que esta aplicación del artículo 3.3(b) interfiere de forma ilimitada con el derecho fundamental al disfrute de la propiedad que tienen todas las personas y viola el debido proceso de ley de los funcionarios públicos al no informarles adecuadamente qué relaciones contractuales de negocio están prohibidas y penalizadas.

En vista de que el artículo 3.3(b) no da información suficiente a los funcionarios públicos sobre qué tipo de relaciones contractuales de negocio están impedidos de realizar con instituciones que contratan con la entidad gubernamental, y en vista de que dicho artículo no provee guías para su implantación, entendemos que el mismo es nulo por razón de vaguedad, y por lo tanto la pena impuesta es igualmente nula. No obstante, por estar de acuerdo con el resultado de la sentencia que en el día de hoy emite este Tribunal, concurrimos.

Compete a la Legislatura de Puerto Rico, en todo caso, enmendar el artículo 3.3(b) de la Ley de Ética para incorporar unas definiciones mas precisas y exactas, a tono con el propósito de la ley; y a la Oficina de Ética modificar su reglamento de conformidad con las enmiendas que se aprueben para sanar el problema de vaguedad que hemos señalado.

En cuanto a la alegada violación por el Alcalde de Ponce del Art. 4.4(12) de la Ley de Ética Gubernamental, estamos

conformes con lo resuelto en la Opinión del tribunal en los acápites I y II.

**CASO CC-1999-144**

En el recurso CC-1999-144, recurre ante nos la Oficina de Ética Gubernamental, para solicitar que revoquemos la sentencia del Tribunal de Circuito de Apelaciones, que resolvió que el Alcalde del Municipio de Bayamón, Hon. Ramón Luis Rivera, no violó el artículo 3.3 (b) de la Ley de Ética Gubernamental, *supra,* y dejó sin efecto la multa administrativa de cuatro mil dólares ($4,000.00) que dicha agencia le había impuesto a éste.

A.

Un grupo de personas de la comunidad y algunos empleados del Municipio de Bayamón se organizaron para recaudar fondos con el propósito de donar un automóvil a la esposa del Alcalde, Angélica Cruz de Rivera. Ello para que ésta lo utilizara en las diferentes labores cívicas que realizaba. Luego de varias gestiones, el grupo adquirió de Losada Auto Corp. (en adelante "Losada"), una guagua Lúmina del 1990, la cual sería pagada a plazos por dicho grupo.

Al fallecer el Sr. Reynaldo Santiago, -líder del grupo- y luego de haberse realizado algunos pagos, la deuda del vehículo quedó al descubierto.

Para cobrar esta deuda, Losada envió una carta a la Sra. Inés Barnés, miembro del grupo. Copia de la carta fue enviada a la esposa del Alcalde. Al enterarse el Alcalde de la deuda pendiente de pago, éste decidió pagarla.

Así las cosas, la Oficina de Ética Gubernamental comenzó un procedimiento en contra del Alcalde, por entender que al éste pagar la totalidad de la deuda a Losada, incurrió en violación al Artículo 3.3(b) de la Ley de Ética Gubernamental, Ley Núm. 12 de 24 de julio de 1985, 3 L.P.R.A. sec. 1823(b). Celebrada una vista evidenciaria, la Oficina de Ética Gubernamental le impuso una

multa administrativa de $4,000.00.

Inconforme, el Alcalde recurrió al Tribunal de Circuito de Apelaciones, el cual revocó la determinación de la Oficina de Ética Gubernamental. Se fundamentó en la total ausencia de prueba que avalara la multa impuesta.

De esta sentencia recurrió ante nos la Oficina de Ética Gubernamental, aduciendo que el tribunal apelativo erró al resolver que el Alcalde no había incurrido en violación a la Ley de Ética, *supra.*

B.

El artículo 3.3(b) de la Ley de Ética Gubernamental, *supra*, penaliza el que un funcionario público acepte relaciones contractuales de negocio con una persona o negocio que a su vez haga negocios con la institución para la cual trabaja el funcionario si el funcionario participa en las decisiones institucionales o tiene facultad para decidir o influenciar las actuaciones oficiales de la institución que tengan relación con dicha persona o negocio.

En el caso que nos ocupa el Alcalde de Bayamón es un funcionario público. Además, no existe controversia en cuanto a que Losada mantuvo negocios con el municipio de Bayamón. Por consiguiente, la controversia a ser resuelta es si la prueba que desfiló ante la Oficina de Ética Gubernamental demostró que efectivamente el Alcalde aceptó "relaciones contractuales de negocio" con Losada, en violación de la ley.[42]

C.

Es principio conocido del derecho administrativo que las determinaciones que realiza una agencia tienen que estar sustentadas por evidencia sustancial que obre en el expediente.[43] Así, hemos sostenido que las conclusiones e interpretaciones de

---

[42] Por las razones expuestas anteriormente en el Caso CC-1998-68, entendemos que el artículo 3.3 (b) de la Ley de Ética Gubernamental según vigente a la fecha de este caso, es inconstitucional. No obstante, entendemos que aún si pudiera salvarse el problema constitucional, los hechos ante nos no constituyen una violación a dicho artículo, según discutimos adelante.

[43] Demetrio Fernández, Derecho Administrativo y Ley Uniforme de Procedimientos Administrativos, Forum, 1993, pág. 595.

los organismos administrativos merecen gran deferencia, si las mismas están sostenidas por evidencia sustancial. *García Oyola v. Junta de Calidad Ambiental*, res. el 21 de febrero de 1997, 142 D.P.R. __ (1997), 97 J.T.S. 25; *Metropolitana S.E. v. A.R.P.E.*, res. el 10 de abril de 1995, 140 D.P.R. __ (1995), 95 J.T.S. 39.

Se entiende como sustancial aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión.[44] En *Metropolitana S.E. v. A.R.P.E.*, supra, sostuvimos que para que un tribunal pueda decidir que la evidencia en el expediente administrativo no es sustancial, es necesario que la parte afectada demuestre que existe otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia, hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la prueba presentada; y hasta el punto de que se demuestre claramente que la decisión del organismo administrativo no está justificada por una evaluación justa del peso de la prueba que tuvo ante su consideración.

Es decir, la parte que impugna la determinación de una agencia tiene el peso de probar que la misma fue arbitraria, irrazonable o ilegal, o que se tomó en ausencia de evidencia sustancial. *Henríquez v. C.E.S.*, 120 D.P.R. 194 (1987).

No obstante, hemos resuelto además, que aunque la revisión judicial está condicionada por la deferencia que merece el organismo administrativo, esta deferencia no

---

[44] *Íd.*, pág. 529.

otorga grado alguno de inmunidad a la actividad administrativa. *Misión Industrial v. Junta. de Planificación*, res. el 21 de marzo de 1997, 142 D.P.R. ___ (1997), 97 J.T.S. 34. A tenor, las determinaciones de una agencia estarán sujetas a ser revisadas judicialmente si el foro apelativo se encuentra ante una actuación arbitraria, ilegal o irrazonable, o ante determinaciones huérfanas de prueba sustancial en la totalidad del récord pertinente. *Íd.*

De la transcripción de las vistas llevadas a cabo por la Oficina de Ética Gubernamental, surge que el Sr. Luis Mayoral fue el vendedor del vehículo en cuestión. Este declaró que las gestiones para la adquisición del automóvil fueron realizadas por teléfono y que él habló con la Sra. Inés María Barnés Pagán, Directora de Relaciones Públicas, Prensa y Comunicaciones del Municipio de Bayamón y una de las personas del grupo que se organizó para recaudar fondos para la donación de un automóvil a la esposa del Alcalde. Testificó además, que en primer lugar se prestó una "pick up" para que fuera probada y luego un vehículo Lumina que fue el que finalmente se vendió. Añadió que estas personas solicitaron que la venta del vehículo fuera de forma "no convencional" de manera que los pagos se realizarían periódicamente según se obtuvieran los fondos de distintas actividades a realizarse. Que las personas encargadas solicitaron que el vehículo se registrara a nombre de la Sra. Angélica Cruz de Rivera –esposa del Alcalde de Bayamón– lo que se hizo. Señaló además, que <u>ni el alcalde Ramón Luis Rivera ni su esposa participaron de ninguna gestión en torno al vehículo en cuestión.</u>[45]

Ralph Reynolds, Gerente de Ventas del Departamento de Flotas del Gobierno de Losada, declaró que no tuvo nada que ver

---

[45] Transcripción de la Vista, 20 de noviembre de 1996, págs. 14-65.

con la compra del automóvil en cuestión. Que puede ocurrir que un automóvil se registre a nombre de una persona diferente al que lo pague.[46]

El señor Diosdado Madera, Jefe del Departamento de Cobros de Losada, señaló que la cuenta por cobrar de la venta del automóvil se registró a nombre de Angélica Cruz de Rivera. Que cuando inició sus gestiones de cobro sobre la cuenta, envió una carta de cobro a la Sra. Barnés. Aceptó que en dicha carta expresó que el acuerdo original era entre la Sra. Barnés y Losada. Que recibió de la Sra. Angélica Cruz el saldo de $18,350.00.[47]

Finalmente la señora Barnés testificó que el señor Reynaldo Santiago se comunicó con ella y otras personas, para recaudar fondos para la donación de un automóvil a la esposa del Alcalde, ya que ésta realizaba muchas labores cívicas y no tenía automóvil. Que el señor Santiago los reunió a ella y a un grupo de personas para ver si estaban dispuestos a colaborar haciendo varias

---

[46] *Íd.*, pág. 69.
[47] *Íd.*, págs. 75-111.

actividades para adquirir dicho automóvil. Que el grupo contactado por el señor Santiago se componía de empleados del Municipio de Bayamón y de personas de la comunidad. Que el vehículo que adquirieron fue una guagua Lúmina. Que para levantar los fondos se realizó una rifa y una verbena. Que al morir el señor Santiago, nadie del grupo asumió la responsabilidad del pago. Que cuando se estaban realizando las gestiones iniciales, ni siquiera en Losada se sabía para quién era el automóvil. Que cuando de Losada le envían la carta de 2 de junio de 1994 señalándole que "[s]egún acordado en 1991 les requerimos el pago total de $18,500.00 que quedaron pendiente en relación al crédito asumido por usted de la guagua Lúmina del 1990....", es que ella recuerda la deuda pendiente.[48] Que de esta carta se le envió copia a la esposa del Alcalde, y que éste se molestó mucho al enterarse que lo habían involucrado junto a su esposa en ese problema. El Alcalde le indicó que él se haría cargo del asunto.[49]

En el contrainterrogatorio la señora Barnés declaró que el señor Reynaldo Santiago era una persona que vivía en Bayamón, que realizaba labores cívicas. Señaló además, que ni el Alcalde ni su esposa conocían los trámites para la adquisición del vehículo.[50]

De este resumen de la prueba oral surge que efectivamente se reunieron un grupo de personas para donarle un automóvil a la esposa del Alcalde, para que realizara las labores cívicas que ésta llevaba a cabo de forma gratuita. Que estas personas fueron a Losada y allí compraron una guagua Lúmina. Que consiguieron un convenio para hacer los pagos. Que a la Sra. Barnés se le envió una carta de cobro, y que de dicha carta se le envió copia a la esposa del Alcalde. Que una vez éste se enteró de la situación,

---

[48] Transcripción de la Vista, 6 de agosto de 1997, pág. 26
[49] *Íd.*, pág. 27.

optó por  saldar el vehículo, con intereses, por lo cual no cabe hablar de privilegios. Esa es toda la prueba que existe en el expediente administrativo.

De la transcripción de la vista no surge que el Alcalde ni su esposa tomaran parte alguna en las negociaciones para la adquisición del vehículo, ni en el alegado cambio de vehículo habido con posterioridad.[51] Todo lo contrario, quedó establecido, mediante la prueba, que ni el Alcalde ni su esposa tuvieron conocimiento de los planes del grupo que obsequió el automóvil.

Ante la evidencia presentada, tampoco cabe hablar de que el Alcalde asumiera la deuda del grupo en cuestión, sino que su participación se limitó al pago de una deuda en favor de tercero que obviamente no configura las "relaciones contractuales" que requiere  el  artículo

---

[50] *Íd.*, págs. 2-48.

[51] La Regla 10 de las de Evidencia, 32 L.P.R.A. Ap. IV, establece que el peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por ninguna de las partes y que la obligación de presentar evidencia primeramente recae sobre la parte que sostiene la afirmativa en la cuestión en controversia.

3.3(b), *supra*. El Alcalde, con mucha dignidad, le dio el frente al pago de una deuda de la cual no era legalmente responsable; su actuación respondió a valores éticos incuestionables; poco ético hubiera sido ignorar el asunto y dejar que el balance quedara sin solventar.

El Alcalde, mediante el recurso de revisión judicial incoado ante el foro apelativo, demostró que no existe prueba sustancial en el expediente administrativo que justifique la determinación de la Oficina de Ética Gubernamental. Así lo demuestra la transcripción de la vista que hemos estudiado. Es decir, no existe evidencia sustancial que una mente razonable pudiera aceptar como adecuada para sostener la multa impuesta.

Tomando en consideración las circunstancias tan particulares del presente caso, lo que muestra la evidencia en el haber del expediente es que la intervención del Alcalde fue una incidental y más bien regulada por la buena fe. Los hechos que dieron lugar a la querella en contra de éste, denotan que no nos enfrentamos ante un acto de corrupción ni de indebida influencia de poder para obtener ventajas o privilegios. Tampoco existe prueba sustancial que demuestre un conflicto de intereses.

A tenor, entendemos que de una evaluación objetiva del expediente administrativo, no existe base para la imposición de una multa al Alcalde de Bayamón por los hechos que dieron lugar a la presente controversia. Concluimos que la determinación de la Oficina de Ética Gubernamental no estuvo justificada por evidencia sustancial, ni por una evaluación razonable de la totalidad del expediente. Confirmaríamos el dictamen del Tribunal de Circuito de Apelaciones. Por estar de acuerdo con el resultado, concurrimos con la sentencia que en el día de hoy emite este Tribunal.

Baltasar Corrada del Río
Juez Asociado